**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAVE LONG BEACH ISLAND, INC., a non-profit corporation, P.O. Box 579, Ship Bottom, NJ 08008; ROBERT STERN, PHD., an individual, 329 4th Street, Beach Haven, NJ 08008; CAPTAIN ALAN SHINN, an individual, 100 Fairview Place, Neptune Township, NJ 07753; KLINE BROTHERS LANDSCAPING, 345 E Bay Ave, Manahawkin, NJ 08050; COASTAL LIVING REAL ESTATE GROUP, 18 S Bay Ave, Beach Haven, NJ 08008; CAPTAIN MIKE YOUNG, an individual, 44 Black Rock Rd., Yardley PA 19067; SEA SHELL RESORT, 10 S Atlantic Ave, Beach Haven, NJ 08008; LBT10 TAXPAYERS ASSOCIATION INC., a non-profit corporation, P.O. Box 2065. Long Beach, NJ 08008; GARDEN STATE SEAFOOD ASSOCIATION, 1636 Delaware Ave, Cape May, NJ 08204; VACATION RENTALS JERSEY SHORE, LLC, a corporation, 518 Central Ave, Ship Bottom, NJ, 08008; | |
| *Plaintiffs*, | Case No. |
| v. | Judge |
| U.S. DEPARTMENT OF COMMERCE, 1401 Constitution Avenue, NW, Washington, DC 20230; HOWARD LUTNICK, in his official capacity as Secretary of Commerce, 1401 Constitution Avenue, NW, Washington, DC 20230; NATIONAL MARINE FISHERIES SERVICE, 1315 East-West Highway, Silver Spring, MD 20910; and EUGENIO PIÑEIRO | |

1

SOLER, in his official capacity as Assistant Administrator, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910; BUREAU OF OCEAN ENERGY MANAGEMENT, 1849 C Street NW, Washington, DC 20240; WALTER CRUICKSHANK in his official capacity as the Director of the Bureau of Ocean Energy Management, 1849 C Street NW, Washington, DC 20240; US DEPARTMENT OF INTERIOR, 1849 C Street NW, Washington, DC 20240; DOUG BURGUM, Secretary of the Interior, in his official capacity as Secretary of the Interior, 1849 C Street NW, Washington, DC 20240;

*Defendants*

**Complaint For Declaratory and Injunctive Relief To Set Aside Final Agency Action**

Plaintiffs ROBERT STERN, PH.D.; SAVE LONG BEACH ISLAND; CAPTAIN ALAN SHINN; KLINE BROTHERS LANDSCAPING; COASTAL LIVING REAL ESTATE GROUP; CAPTAIN MIKE YOUNG; SEA SHELL RESORT; LBT10 TAXPAYERS ASSOCIATION INC.; GARDEN STATE SEAFOOD ASSOCIATION; and, VACATION RENTALS JERSEY SHORE, LLC ("Plaintiffs") by its attorney files this Complaint against Defendants UNITED STATES DEPARTMENT OF COMMERCE; UNITED STATES SECRETARY OF COMMERCE HOWARD LUTNICK; NATIONAL MARINE FISHERIES SERVICE; DIRECTOR OF THE NATIONAL MARINE FISHERIES SERVICE, EUGENIO PIÑEIRO SOLER; BUREAU OF OCEAN ENERGY MANAGEMENT; DIRECTOR OF THE BUREAU

2

OF OCEAN ENERGY MANAGEMENT WALTER CRUICKSHANK; and, US DEPARTMENT OF INTERIOR; SECRETARY OF THE INTERIOR DOUG BURGUM ("Defendants"), and alleges the following.

**Nature of the Action**

1.      This is an action for declaratory and injunctive relief, challenging the failure of the Bureau of Ocean Energy Management's ("BOEM") and National Marine Fisheries Service ("NMFS") to comply with numerous statutes and their implementing regulations, including: the Marine Mammal Protection Act ("MMPA"), the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), the Outer Continental Shelf Lands Act ("OCSLA"), the Coastal Zone Management Act ("CZMA"), and the Administrative Procedures Act ("APA"). Plaintiffs seek orders vacating and setting aside as unlawful the recent project Record of Decision ("ROD") issued by BOEM approving Atlantic Shores South (hereinafter, "Atlantic Shores"), the Biological Opinion, and the Letter of Authorization issued by NMFS for Atlantic Shores.

2.      On February 4, 2016, BOEM awarded the lease to the area currently designated as OCS-A-0499 and 0570, on which the Atlantic Shores South project is to be placed.

3.      On May 15, 2023 BOEM issued the draft Environmental Impact Statement ("DEIS") for the Atlantic Shores Wind Project.

4.      On May 23, 2024, BOEM issued the Final Environmental Impact Statement ("FEIS") for the proposed the proposed Atlantic Shores Wind Project.

5.      NMFS' issuance of the Biological Opinion ("BiOp"), and BOEM's award of the lease to the project area and issuance of the ROD, now constitute final agency actions pursuant to the APA.

6.      NMFS' Biological Opinion and BOEM's FEIS are violative of both the ESA and

3

NEPA respectively. NMFS' BiOp is flawed and unlawful, BOEM's reliance on the BiOp in approving Atlantic Shores was arbitrary and capricious.

7.      NMFS' approval of the MMPA Incidental Take Authorization (ITA) was arbitrary and capricious.

8.      BOEM's approval of the Atlantic Shores project certifies that the Atlantic Shores project is consistent with the enforceable policies of the NJ CZMA rules, as already certified as consistent by the NJDEP. However, BOEM's approval of the project without independent analysis of the NJ CZMA rule criteria constitutes an arbitrary and capricious agency action as the administrative record points to a number of criteria such as the loss of 200 jobs in the tourism industry that cannot be met and that therefore Atlantic Shores project is not concordant with the NJ CZMA rules.

9.      In this suit, Plaintiffs ask this Court to invalidate the putative approvals of the Atlantic Shores Project until and unless the Federal Government complies with the relevant statutes and regulations. Each federal statute delineated infra provides independent grounds on which the approval of Atlantic Shores should be vacated.

10.      In all of the allegations, *infra*, Plaintiffs incorporate by reference all contents of their Notice of Intents to Sue under the ESA, including the initial ESA NOI to sue of March 15, 2024, the supplemental ESA NOI to sue of July 16, 2024 (and all attendant SLBI reports attached therewith), and the OSCLA NOI to sue of August 13, 2024 and their supplemental OSCLA NOI to sue of September 12, 2024 (as well as the Notices of Adoption in connection therewith).

## Jurisdiction and Venue

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 16 U.S.C § 1361

et seq. (MMPA), 28 U.S.C. § 2201 (declaratory judgment), 42 USCS § 4321 et seq. (NEPA), 16

U.S.C. 1531 et seq. (ESA), 43 U.S.C. § 1331 et seq. (OCSLA), 16 U.S.C. § 1451 et seq (CZMA),

and 5 U.S.C. § 701 through 706 (APA).

12.    Final agency decisions are subject to judicial review. Plaintiffs have met all

applicable statute of limitations, namely, the six-year statute of limitations, pursuant to 28 U.S.C.

§ 2401, and the two-year statute of limitations for FAST-41 Act, set forth at 42 USCS § 4370m-

6(a)(1)(A).

13.    For all claims brought under the APA, Plaintiffs have exhausted all administrative

remedies available to them.

14.    Pursuant to 16 U.S.C. § 1540(g), on March 14, 2024, Plaintiffs sent a 60-day notice

of intent ("NOI") to sue to NMFS and BOEM over their respective failures to comply with the

ESA when reviewing and approving the Atlantic Shores project, including the issuance of the

Project's BiOp, dated December 18, 2023. On July 16, 2024, Plaintiffs submitted a Supplement to

their ESA NOI which incorporated by reference everything prior, and further included citation to

more technical documents produced by SLBI. This restarted the 60-day clock. Co-plaintiffs not

listed on the original or supplemental NOI submitted a "Notice of Adoption" of those notices via

email and U.S. mail. Those adoption notices did not add any new allegations or claims, and thus,

did not extend the 60-day time frame.

15.    Pursuant to 43 U.S.C. § 1331 et seq. (OCSLA), Plaintiffs sent a notice of intent to

sue of August 13, 2024 and their supplemental OSCLA NOI to sue of September 12, 2024. Co-

plaintiffs not listed on the original or supplemental NOI submitted a "Notice of Adoption" of those

notices via email and U.S. mail. Those adoption notices did not add any new allegations or claims,

and thus, did not extend the 60-day time frame.

16.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e) because all of the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**Parties**

17.     Plaintiff SAVE LONG BEACH ISLAND is a 501(c)(3) non-profit corporation, of over 10,000 supporters, organized under the laws of New Jersey, and created to guard human and natural resources. These resources include, for example: marine mammals, fish, and other species that inhabit, use, or migrate off the New Jersey and New York coasts; the aesthetic elements of Long Beach Island and the New York Bight; economic interests strongly tied to the maintenance of the environmental features comprising Long Beach Island and the New York Bight, inter alia. These resources, in particular, the marine mammals off the NJ and NY coasts, are being and will be further harmed, harassed, and killed, in large part by the activities authorized by NMFS and BOEM in the waters of the NJ/NY Bight. These marine mammals, not only are exceptionally important to the oceanic ecosystems, but they also impart carbon dioxide mitigatory effects. Save Long Beach Island supporters have a legally protected interest in preserving the marine mammals, some of which, like the North Atlantic Right Whale, are critically endangered species. See paragraph for Dr. Robert Stern, *infra*, for the purposes of Save Long Beach Island's standing.

18.     Plaintiff Robert Stern, Ph.D., is a learned individual residing in Long Beach Island, New Jersey. He holds a Doctorate degree in Applied Mathematics and Aeronautical Engineering from the New York University Courant Institute of Mathematics and Engineering School respectively. He previously managed the Office of Environmental Compliance in the United States Department of Energy that was responsible for the review of all of that Department's environmental impact assessments and statements. He is now the president of Save Long Beach

Island, and believes it to be his responsibility to guard the natural resources of Long Beach Island and the waters adjacent to it, including the land animals, plants, and marine life. Dr. Stern is concerned with all aspects of the wind turbine development process, and one focus of this action is on the harmful preparatory activities, in the form of seabed characterization which utilize high intensity noise devices.

19.    Plaintiff ROBERT STERN PHD, is the president of Save Long Beach Island, Inc. Dr. Stern personally observes whales, very likely including humpbacks and north Atlantic right whales, and dolphins, and very likely including bottlenose dolphins (such as the northern coastal migratory bottlenose dolphin) from the coast of LBI and derives aesthetic and recreational enjoyment therefrom.  On September 6th 2023, he departed for an excursion into the NJ/NY Bight, over the waters which include Atlantic Shores, in which he sought to observe whales and dolphins (including bottlenose dolphins, such as the northern coastal migratory bottlenose dolphin) in the waters of that region. Furthermore, he has plans for future excursions in September 2025 into the NJ/NY Bight for further whale watching and dolphin observations, in the areas including the future construction of Atlantic Shores. The Northern Coastal Migratory Bottlenose dolphin has a range from about Sandy Hook, NJ southward to Virginia.[1] Its inter-seasonal migration thus encompasses spatial domain from Sandy Hook, NJ to VA, and is most prevalent in the waters east of NJ during the May-September period, which overlaps with the time frame when Dr. Stern most enjoys observing whales and dolphins from the beach of LI. The agency authorized Atlantic Shores project will impair Dr. Stern's ability to view, observe and enjoy the bottlenose dolphins, whales (including humpback and right whale) both from the beach of LBI and on future excursions in the

---

[1] https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_NmigBottlenoseDolphin.pdf?null

NY Bight offshore, including in the waters of prospective Atlantic Shores activities and beyond, where the underwater noise from those activities will disturb the behavior of these marine mammals (conceded by the agencies with Level B harassment takes) and even killing them. Dr. Stern's present enjoyment and future concrete plans to observe these species east of LBI will be impeded due to Atlantic Shores' activities, sanctioned by the NMFS. This harm ascribed to Atlantic Shores, ultimately traced to the NMFS' MMPA ITA approval, would be favorably redressed by Court action. Plaintiff Stern is thus a person for whom the aesthetic and recreational values of the area is and will be lessened due to Atlantic Shores' activities. This harm confers standing under the ESA, MMPA, NEPA, CZMA, and OCSLA.

20.    Other co-plaintiffs in this action include as follows.

21.    Plaintiff CAPTAIN ALAN SHINN has fished the waters off the New Jersey Coast his entire life. He loved it so much that he started working on boats when he was only 11 years old. One could say he was born for this. His grandfather, David Shinn, started a fishing and charter boat business out of Belmar, NJ in 1936. His father took over the family business and he followed in his footsteps. He earned his captain's license when he was just 19 years old and has been safely running boats ever since. All the legacy of Miss Belmar has taught him how to operate boats in a professional and safe manner and how to furnish his vessels for maximum comfort for his passengers. He currently owns and operates three vessels out of the Belmar Marina. With over 40 years' experience, very few can match the expertise that he has in running charters and navigating the coastal waters off the New Jersey Shore. He regularly brings fishing and whale and dolphin watching charters to the waters wherein Atlantic Shores will be constructed, and beyond, where the underwater noise from those construction and later operational activities will disturb and potentially kill those animals. These trips off the New Jersey coast therefore include, but are not

limited to, the very areas on which Atlantic Shores will be constructing and beyond. While on those trips, he (and his customers) regularly observes dolphins and whales in the waters in which Atlantic Shores will be constructed. They often observe humpback whales, sharks, rays, sea turtles, and bottlenose dolphins, which includes the Northern Coastal Migratory Bottlenose Dolphin at issue in this case.[2] They (Alan Shinn and his customers) enjoy the experience of observing all of these creatures and derive great aesthetic and recreational pleasure and value from experiencing the beauty of these creatures. Therefore, he is a person for whom the aesthetic and recreational values of the area are and will be lessened due to the allowance of the Atlantic Shores' ITA (approved by the National Marine Fisheries Service) which will disturb whales and dolphins (including the northern coastal migratory bottlenose dolphin) negatively impacting and impairing his ability (and his customers' ability) to personally observe the dolphins and whales. This area is biologically rich and productive, teaming with fish, whales and dolphins and is economically important to Miss Belmar, Inc. He will be economically harmed via Atlantic Shores as his business (Miss Belmar) relies heavily upon tours of marine mammals in the Atlantic Shores area. Furthermore, he is a business owner for whom the economic and recreational values of the area is and will be lessened due to the allowance of the Atlantic Shores ITA which will disturb dolphins (including the northern coastal migratory bottlenose dolphin) negatively impacting and impairing his ability to bring passengers to observe the dolphins in this area which is a critical part of his business. Our season begins in May and ends in October and we focus our trips on when the whales and dolphins are present. Often, June-September is our peak season when we have the majority of

---

[2] The primary bottlenose dolphin east of Monmouth County is the Northern Coastal Migratory Bottlenose Dolphin, the species at issue in this case. The offshore form of the bottlenose dolphin is found much, much farther offshore near the eastern edge of the continental shelf. https://conservewildlifenj.org/?species=tursiops-truncatus&utm_source=chatgpt.com

our whale and dolphin trips. We run 2 trips per day, 7 days per week from the end of June until Labor Day. After Labor Day we run 6 trips a week until the end of October. We also do dolphin sunset cruises which can be 20 plus trips a week in the summer. So, our whale and dolphin watching business is mostly during the summer months, and if we cannot view dolphins during this time, it will destroy our whale and dolphin tour business. The period happens to be the very time many species are most active in our waters, including the Northern Migratory Coastal Bottlenose Dolphin.[3] And this is also when Atlantic Shores will be constructing the most (May through October). If the whales and dolphins continue to die off or alter their migration routes, that will destroy his ability to view these whales and dolphins, and destroy his business's ability to offer tours to look for them. If people cannot reliably see them on tours, they will not book the tours, and his business will suffer financially. He has noticed an increase in whale carcasses floating in the waters where he does business. When they encounter these dead whales on their trips, their customers become upset, which discourages them from returning for another tour, and leads them to write negative reviews, further discouraging prospective customers. He anticipates that the more dead whales and dolphins he encounters, the fewer trips people will take, leading to a significant loss of business. People hire his company to take them to where marine animals are. Atlantic Shores is and will directly impair his company's ability to successfully do just that. Not only will he suffer economic harm to his business, Miss Belmar, Inc., but he will suffer personal

---

[3] Note that this species of Dolphin is most prevalent May-September in the waters east of NJ. This overlaps with Atlantic Shores' planned busiest pile driving period. https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_NmigBottlenoseDolphin.pdf?null
"During aerial and ship surveys off the New Jersey coast in 2008 and 2009, no sightings of common bottlenose dolphins were made during November–February; bottlenose dolphins were sighted from early March to mid-October and were most abundant during May–August (Whitt et al. 2015."

harm as well. Miss Belmar is a family-run business for 99 years that has been passed down for 3 generations. His daughter, Alannah, is already following in his footsteps and has been learning the ropes of the family business since she was 10 years old. He is preparing to hand the Miss Belmar legacy over to her in the future, making it a 4th generation family business. Therefore, he will suffer aesthetic, recreational and economic harms (negatively affecting Miss Belmar business due to disturbed marine mammals in the Atlantic Shores area, attributable to the agency's approval of the Atlantic Shores ITA) and personal harm to his family and his family's legacy. This harm is traceable to the agency sanctioned Atlantic Shores' activities, and a favorable Court decision will redress this harm. This harm confers standing under the ESA, MMPA, NEPA, CZMA, and OCSLA.

22.     Plaintiff Kline Brothers Landscaping, owned by Josh Kline, is a full-service landscaping and fiberglass pool company based in New Jersey, with over 200 employees and a client base including more than 6,000 residential and commercial properties across the state. Many of its customers are located on Long Beach Island and operate short-term vacation rentals, which rely on high summer occupancy and tourism. Mr. Kline also regularly surfs off the coast of LBI and has frequently encountered whales and dolphins while doing so, deriving aesthetic and recreational enjoyment from these interactions. Kline Brothers' business success is closely tied to the tourism economy on Long Beach Island, and that tourism economy is closely tied to the marine health and ocean viewsheds. Mr. Kline is eminently concerned that the construction and operation of the Atlantic Shores offshore wind project will have adverse effects on marine mammals and ocean viewsheds, which will in turn discourage tourism and reduce short-term rental demand. This is an imminent concern. A decrease in vacation activity on LBI would directly reduce client demand for pool installations, outdoor amenities, and landscaping services. The agency sanctioned

Atlantic Shores will, undoubtedly, negatively impact the ocean viewsheds, likely decreasing vacation activity on LBI, thereby harming Plaintiff Kline Brothers' business. Thus, Plaintiff Kline Brothers has a concrete economic interest, conferring harm under OCSLA,  and Kline Brothers is harmed by the approval of the project, which is redressable by this Court. See, for example, 43 U.S.C. § 1337(p)(4)(I), which requires the Secretary to ensure the "prevention of interference with . . . reasonable uses . . . of the high seas." Plaintiff relies on Long Beach Island's thriving tourism economy, which is inextricably linked to visitors' enjoyment of the ocean environment and views. The Atlantic Shores project will degrade these values, diminish tourism and directly harm Plaintiff's business through reduced demand for landscaping and outdoor amenities associated with vacation properties.

23.     Plaintiff Coastal Living Real Estate Group is owned by Bonnie Wells; the organization is a prominent force within the local real estate landscape, consisting of executive associates and consultants that have professional backgrounds in real estate, marketing, staging, journalism, photography, property management, architecture, insurance, business and finance. They incorporate each area of expertise, as they bridge the gap between buyers and sellers. Their entire team has enjoyed LBI for generations, and take pleasure in marketing on a professional and personal level. Bonnie currently has 8 oceanfront listings for sale, 6 on the MLS and 2 that are private.  They range between 4.65 to 10 million dollars.  A 25 percent drop supported by a previous study done mean a reduction of 1.7 to 2.5 million dollars in house value. Buyers inquiring about these properties are already hesitant about making an investment that can result in a severe price decrease based on the wind turbines, and additionally, voiced that they will not be interested in purchasing the proposed wind turbine view at all.  Prospective buyers and investors are now routinely asking whether turbines are coming to LBI, and stating that they have no intention of

buying if they are. As such, this project (Atlantic Shores) will very likely have a significant adverse effect on their sales and commissions. Thus, Plaintiff's economic injury (conferring standing under OCSLA, for example, see, 43 U.S.C. § 1337(p)(4)(I), "prevention of interference with . . . reasonable uses . . . of the high seas" – Plaintiff depends on the continued availability and enjoyment of ocean views as a key component of their real estate marketing and sales activity. Prospective buyers and investors' decisions are directly tied to the unobstructed views of the Atlantic Ocean, a reasonable use of the high seas that will be substantially impaired by the Atlantic Shores project) is traceable to the agencies' arbitrary and capricious approval of Atlantic Shores, redressable by this Court.

24.    Plaintiff Captain Mike Young is a US Coast Guard Master Captain, is a recreational fisherman, and represents the interests of recreational fishermen. This project will negatively impact the fishermen. From the perspective of the recreational fishermen, they are very concerned that the turbines, substations, installation and restrictions will adversely affect immediate access to thousands of acres of ocean as well as travel from inshore to offshore fishing grounds. New Jersey's fishery resources contribute more than $2 billion annually to the state's economy. New Jersey recreational fisheries are among the nation's leaders in terms of angler expenditures, revenue generated, and angler participation. Plaintiff Captain Mike's recreational fishing will be impaired through not only the impacts of the Atlantic Shores project on displaced marine life, but the physical obstruction of the Atlantic Shores Project will impair Plaintiff Captain Mike's ability to adequately access, use, and navigate, the waters east of southern NJ for recreational fishing grounds. Thus, his ability to derive recreational value from fishing and utilize the waters adjacent to and within the Atlantic Shores area will be significantly diminished as a result of Atlantic Shores, traceable to the agencies' approvals of the project, and redressable by this Court. As such,

13

Captain Mike Young will be harmed by the Project. This harm confers standing under the ESA, MMPA, NEPA, CZMA, and OCSLA.

25.     Plaintiff Sea Shell Resort is owned by Thomas J. Hughes. The Sea Shell is a full-service oceanfront resort hotel, restaurant and banquet facility on Long Beach Island. Many of the hotel's guests come to enjoy the natural views of the Atlantic Ocean, the local marine environmental, and the quiet, undeveloped coastline. The Atlantic Shores project will significantly alter the viewshed from the resort's beachfront property and diminish the aesthetic and recreational value that draws guests to the Sea Shell. Plaintiff Hughes will very likely experience a decline in bookings and long-term revenue as a result of the agency sanctioned Atlantic Shores. His customers come to the shore for fun and relaxation and to enjoy the natural beauty of the beaches, ocean and our views. This project has the potential to destroy not only his business, but the 44-billion-dollar tourist economy of the entire New Jersey shore. These harms are traceable to the agencies' action and redressable by this Court. Thus, Plaintiff's economic injury (conferring standing under OCSLA, for example, see, 43 U.S.C. § 1337(p)(4)(I), "prevention of interference with . . . reasonable uses . . . of the high seas" – Plaintiff depends on the continued availability and enjoyment of ocean views as a key component of their bookings and long-term revenue. Prospective hotel guests' decisions are directly tied to the unobstructed views of the Atlantic Ocean, a reasonable use of the high seas that will be substantially impaired by the Atlantic Shores project).

26.     Plaintiff LBT10 Taxpayers Association Inc. is a non-profit corporation created under the Non-Profit Corporation Law of the State of New Jersey. LBT10 operates as a non-political, volunteer group of individual members who are real property owners and taxpayers of Long Beach Township, on Long Beach Island, Ocean County, New Jersey, dedicated to:

maintaining their property values; minimizing their property tax burdens; ensuring the economic and environmental viability of their community; and enhancing the quality of life for all property owners, residents, and visitors of or to Long Beach Township. LBT10 serves principally as an educational and informational resource and advocate to foster informed communication between taxpayers and township and other government officials, in a politically unbiased public interest manner, in matters of government resource allocation, infrastructure projects, public safety issues, residential and commercial regulations, ordinances, land use planning, zoning, building codes, impact of significant public policy questions, real property tax assessments, government budgetary commitments, future plans, and related matters. LBT10 is joining this cause of action as a co-plaintiff on behalf of its members in accordance with its purpose as an advocate for their positions. Based upon their informed judgement, members are concerned that these projects pose a substantial risk of direct and irreparable harm to their property values, and to the economic and environmental viability, character, and quality of life for all of Long Beach Island as a historically prominent location on the New Jersey shore.

27.    Plaintiff Garden State Seafood Association is a New Jersey Association with more than 1,200 members, consisting of fishing vessels, commercial fishermen, shore-based seafood processors, commercial dock facilities, seafood markets, restaurants, and other New Jersey-based commercial fishing industry businesses. The Association is dedicated to the sustainable harvest of New Jersey's inshore and offshore waters and promotes the interests of the commercial fishing industry and seafood consumers in New Jersey. The Association collectively harvests more than $125 million worth of seafood products annually and supports 2,000 jobs in New Jersey. The Association, which is a member of the Responsible Offshore Development Alliance, has advocated for BOEM to develop mitigation requirements for offshore wind projects so that BOEM can meet

15

the mitigation hierarchy outlined in the National Environmental Policy Act and hold developers accountable for the unmitigable harm these offshore wind projects have to coastal communities, fishing interests, and the environment. The Association's chief concerns about the Atlantic Shores South Project stem from BOEM's failure to consider the adverse environmental impacts to the area before selecting the lease sites and the true cumulative impacts of the Project; failure to adequately evaluate and expand upon the adverse impacts to navigation and the fishing industry; failure to include transit lanes and to space the turbines a minimum of two nautical miles apart; and failure to provide transparent information on power generation, pricing, and economic impacts.

28.     Plaintiff Vacation Rentals Jersey Shore, LLC, ("VRJS") marketing company that promotes rental properties for owners and Realtors at three popular shore destinations. Long Beach Island, Wildwood and Ocean City NJ. They are a local New Jersey business headquartered on Long Beach Island and currently promote around 3000 rental properties with about 2000 on LBI. As per their research survey data, 74% of people would not rent on LBI following the construction of Atlantic Shores' projects. Besides their opposition on environmental and recreational fronts, the tourist rental market will be decimated, with 74% fewer families undertaking vacation rentals. There are approximately 3000 rental units on Long Beach Island and as such, substantially fewer of these will be rented, economically harming Plaintiff VRJS. Thus, this highly likely economic harm (substantially lower rentals of customers) due to Atlantic Shores, is traceable to the agencies' authorizations of Atlantic Shores, redressable by this Court. Thus, Plaintiff's economic injury confers standing under OCSLA. See, for example, 43 U.S.C. § 1337(p)(4)(I), which requires the Secretary to ensure the "prevention of interference with . . . reasonable uses . . . of the high seas." Plaintiff depends on the continued availability and enjoyment of ocean views as a critical factor

16

driving demand for the rental properties it markets. Prospective vacation renters' decisions are directly tied to the unobstructed views and natural aesthetic of the Atlantic Ocean, a reasonable use of the high seas that will be substantially impaired by the Atlantic Shores project.

29.    Defendant NMFS is an agency of the federal government, within the United States Department of Commerce's National Oceanic and Atmospheric Administration. "NOAA Fisheries, also known as the National Marine Fisheries Service, is responsible for the management, conservation, and protection of living marine resources within about 200 miles of the U.S. coast."[4]

30.    Defendant EUGENIO PIÑEIRO SOLER is the director of the NMFS.

31.    Defendant HOWARD LUTNICK is the Secretary of the United States Department of Commerce.

32.    Defendant U.S. DEPARTMENT OF COMMERCE is an executive department of the U.S. federal government.

33.    Defendant BOEM is a federal agency within the U.S. Department of Interior, tasked with managing the "development of U.S. Outer Continental Shelf (OCS) energy, mineral, and geological resources in an environmentally and economically responsible way."[5]

34.    Defendant WALTER CRUICKSHANK is the Director of BOEM.

35.    Defendant U.S. Department of Interior is an executive department of the U.S. federal government responsible for the management and conservation of most federal lands and natural resources.

36.    Defendant DOUG BURGUM is the Secretary of the Department of Interior.

## Factual Background

---

[4] https://www.usa.gov/agencies/noaa-fisheries#:~:text=NOAA%20Fisheries%2C%20also%20known%20as,miles%20of%20the%20U.S.%20coast.

[5] https://www.boem.gov/about-boem

**Facts Pertinent to NEPA**

37.     On February 4, 2016, the BOEM awarded the lease to the areas currently occupied by the project, deferring EIS review and consideration of reasonable alternative areas to the final project decision and EIS.

38.     On June 22, 2022 the BOEM issued a NEPA policy guidance memorandum titled the "Process for Identifying Alternatives for Environmental Reviews of Offshore Wind Construction and Operations Plans pursuant to the National Environmental Policy Act (NEPA)" resulting in an Agency policy not to include alternative areas for lease in the project EIS.

39.     On May 19, 2023, BOEM published in the Federal Register a Notice of Availability, inviting the public to comment on the Draft EIS for the Atlantic Shores South project. According to the notice, public comments would be accepted through July 3, 2023.

40.     On June 29, 2023, SLBI submitted extensive comments to BOEM identifying defects in the analyses and conclusions set forth in the Draft EIS. By this reference, this Complaint incorporates all points raised, all arguments made, and all evidence presented and discussed in SLBI's June 29, 2023 comment letter.

41.     SLBI's June 29, 2023 comment letter identified more than 100 deficiencies in the Draft EIS, including but not limited to the following:

- The DEIS does not present a substantive purpose and need for the project, without which it is impossible to craft the required reasonable alternatives to it.

- BOEM has improperly segmented the full project, which consists of

  the Atlantic Shores South and North projects.

18

- The DEIS does not provide a scientifically adequate or accurate analysis of operational turbine noise, especially as to any numerical impacts of such noise on the North Atlantic right whale.

- Regarding vessel surveys and construction pile driving, the DEIS uses scientifically unsupportable noise modeling assumptions that under-value noise source levels and over-value sound attenuation and acceptable noise levels and thus underreport the size of the Level A and Level B noise impact contours.

- The DEIS does not analyze recent whale deaths in the project area in connection with vessel surveys conducted for the project.

- The DEIS provides an inadequate analysis of project-related pile driving noise and its impacts on North Atlantic right whale and other cetaceans. The DEIS also provides no reliable support for use of a noise source attenuation from bubble curtain or similar systems of 10 decibels for the large 15-meter diameter foundations and low frequency noise here, for use of a small 0.72 kilometer range for NARW incurring permanent threshold hearing loss, for the use of much lower NARW densities in and near the project area, for the use of auditory weighting functions purporting to show that lower frequency cetaceans do not hear that well at low frequencies, and for not using a probability of response approach for Level B disturbance estimates.

- The DEIS fails to analyze the effect of the project's airborne construction and operational noise at sensitive receptors onshore.

- The DEIS fails to provide an adequate analysis of the project's socio-economic impacts on nearby shore communities and other communities, including lost tourism and the indirect effect of higher electric rates on businesses.

- The DEIS fails to address potential conflicts between the project's wind turbine operations and Department of Defense radars in Gibbsboro, New Jersey.

- The DEIS fails to provide an adequate analysis of the project's impacts on the piping plover and red knot, both of which are protected bird species.

- The DEIS fails to provide an adequate analysis of feasibility of the impacts associated with decommissioning, removal and onshore processing of the Atlantic Shores South wind turbines, foundation sections, and associated components, including whether the affected area could ever be returned to its prior environmental condition.

- The DEIS does not include representative visual simulations of the project's turbine array. This misleads the public as to the magnitude of the project's visual impacts.

- The DEIS's analysis of impacts to historic properties deviates from the rules established by the National Historic Preservation Act. Act. It fails to provide any assurance that now submerged ancient archeological artifacts discovered through the vessel surveys that could shed light on the origin of the first humans to come to North America will be preserved from pile driving disruption.

- The DEIS provides an inadequate range of alternatives and specifically fails to include any alternative where a comparable project would be constructed at a

20

location different from the existing lease area. For example, the DEIS presents no reason why the use of Hudson South is not a reasonable alternative.

- The DEIS fails to consider alternative turbine power levels or alternative numbers of turbines.

- The DEIS recommends mitigation measures that are demonstrably inadequate to address the significant impacts of the project.

- The DEIS fails to provide a legally adequate analysis of the project's cumulative impacts, including those that affect the migratory cycle and other life history events of the North Atlantic right whale.

- The DEIS provides an inadequate assessment of the project's inconsistency/conflicts with the Coastal Zone Management Act, including those of its provisions which protect shoreline visual conditions, tourism jobs, and endangered species.

- The DEIS provides no analysis of the project's multiple, additive, and synergistic impacts on the North Atlantic right whale, especially when considered in the context of the whale's historic migration corridor intersecting the project area and the vessel traffic that will now be concentrated in or near the project area as a result of vessel restrictions in farther out wind project areas.

- The DEIS is too long, difficult to read, and replete with excessive technical and background material and references, which either obscure or do not relate to the

actual project impact. It relies too much on the scoring of impacts as opposed to presenting numerical and descriptive impact of the project itself.

42.     In October 2022, BOEM and NOAA issued a draft document titled BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy (the "NARW and OSW Strategy"), which admits that BOEM's Atlantic OSW program, when viewed in its entirety, has the potential to harm NARW and cause population scale impacts to the species. Key statements from the NARW and OSW Strategy include the following:

- "In March 2021, in response to Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, the Departments of Interior, Energy, and Commerce announced a national goal to deploy 30 gigawatts of OSW by 2030, while protecting biodiversity and promoting ocean co-use." (p. 1.)

- "BOEM and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NOAA Fisheries) recognize [OSW] development (from siting to decommissioning) must be undertaken responsibly including managing and mitigating the impacts to endangered species like the North Atlantic right whale. The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear, necessitating precaution to ensure that OSW development is carried out in a way that minimizes the potential for adverse effects to the species and the ecosystems on which it depends." (p. 1.)

- "The agencies are working to understand the effects of OSW development on NARWs and their ecosystem, and to develop strategies to mitigate and monitor impacts to NARWs from OSW development."

22

- "BOEM and NOAA Fisheries initiated development of this shared draft North Atlantic Right Whale and Offshore Wind Strategy (hereinafter called "Strategy") to focus and integrate past, present, and future efforts related to NARW and OSW development. In response to Executive Order 14008, both agencies share a common vision to protect and promote the recovery of North Atlantic right whales while responsibly developing offshore wind energy. This vision reflects the combined legislative mandates of the two agencies and commitment to the Administration's goal of developing OSW while protecting biodiversity and promoting ocean co-use." (pp. 1-2.)

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed OSW capacity. The OCS is the area of the continental shelf that begins at the edge of state marine boundaries (typically 3 nautical miles offshore except 9 miles for Texas and the west coast of Florida) and extends to 200 nautical miles, and more in some places." (p. 3.)

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables." (p. 3.)

- "In addition, the Biden-Harris Administration has announced the goal of 15 gigawatts of floating OSW capacity by 2035. These metrics of development will change over time; but for purposes of this Strategy, the metrics demonstrate the large-scale nature of the development planned and underway." (p. 3.)

- "Due to the declining status of NARWs, the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and the species achieving optimum sustainable population." (pp. 6-7.)

- "NOAA Fisheries' North Atlantic Right Whale Priority Action Plan for 2021-2025 identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021)." (p. 7.)

- "NARWs engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival (Leiter et al. 2017; Muirhead et al. 2018; Quintana-Rizzo et al. 2021; Zoidis et al 2021). The overlap between OSW development (planned, leased, and permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with the distribution of NARW." (p. 7.)

24

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. It is important to recognize that NARW migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development." (p. 11 [Emphasis added].)

43. The Final EIS for Atlantic Shores South does not assess the impacts of the project in relation to the above-quoted statements from the NARW and OSW Strategy.

44. Due to the deficiencies listed above and in Plaintiffs' comments, the DEIS was legally inadequate. The Final EIS did not cure these deficiencies. Consequently, BOEM erred when it issued the ROD approving the Final EIS.

**Facts Pertinent to MMPA and ESA**

45. Plaintiff SLBI submitted a Notice of Intent to Sue under the ESA on March 15, 2024, and a Supplemental Notice of Intent to Sue under the ESA on July 16, 2024, explicating the innumerous legal deficiencies attendant the BiOp.

46. Plaintiff SLBI submitted a number of documents attendant the Atlantic Shores proposed MMPA rule, on October 23, 2023. These documents addressed, inter alia, the statutory and regulatory violations of "small numbers," "negligible impact," and the extensive scientific evidence demonstrating the deleterious impact of pile driving, operational noise, and high-resolution geophysical ("HRG") surveys on marine mammals.

47. Plaintiff SLBI incorporates by reference all of its submittals in connection with the MMPA ITA, including the Letter, and (5) Five Enclosures.[6]

48. One of principal predicates of this action is the harm that has, is, and will continue, to befall marine mammals, especially Humpbacks and NARW, which will in turn harm Plaintiffs.

---

[6] https://www.regulations.gov/comment/NOAA-NMFS-2023-0068-0061

This marine mammal harm has already, and will continue to eventuate from HRG survey activity. Such HRG survey activity has augmented Level B harassment, which can and frequently does lead to marine mammal mortalities thereby augmenting Level A harassment of marine mammals. As depicted in the graph presented infra, there is a robust *temporal* correlation between increasing vessel surveys and Humpback whale deaths. There is also a robust *spatial* correlation between the vessel survey tracks and stranding locations. The spatiotemporal relationship in concert with temporal priority and elimination of other viable alternative hypotheses leads to the conclusion that the HRG surveys are the most likely cause of this increased mortality.

49.    The HRG surveys authorized under Atlantic Shores' MMPA 5-year ITA Rule permits HRG survey work associated with the project beginning as soon as 2025.

50.    As described *supra*, Plaintiffs will suffer harm in a variety of ways due to Atlantic Shores' project, including and especially, economic, environmental, aesthetic, and recreational, derived from the project's negative impact on marine mammals, tourism, and the shore economy.

### First Cause of Action
### Violation of National Environmental Policy Act and Administrative Procedures Act

51.    Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

52.    The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  NEPA's fundamental purposes are to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur.  To conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environmental effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making

process and the implementation of the decision itself.  See, e.g., 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

53.     For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed EIS that analyzes and discloses the action's environmental consequences.  42 USC § 4332(c); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).  If the agency does not conduct this analytical "hard look" prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."  See 40 CFR § 1500.1(c); Marsh v. Oregon Nat. Resources Council, 490 U.S. 360, 371 (1989).

54.     Relatedly, NEPA requires that the EIS fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project.  40 CFR § 1502.16.  Direct effects include those "which are caused by the action and occur at the same time and place."  40 CFR § 1508.8(a).  Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 CFR § 1508(b).  Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems.  Ibid.  Cumulative impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over time.  40 CFR § 1508.7.

55.     The EIS must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided.  5 USC § 706(2)(D);

40 CFR § 1502.22. However, when information is incomplete or unavailable, the EIS must "always make clear that such information is lacking." 40 CFR § 1502.22. And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives," the agency must include the information in the EIS. Ibid. Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question. Ibid.

56.    The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA." Natural Resources Defense Council v. U.S. Forest Serv., 421 F.3d 797, 812 (9th Cir. 2005). An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action." Id., at 811. For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the EIS to the public and decision-makers. Id., at 808.

57.    In addition, if the EIS identifies a significant effect, the EIS must propose and analyze "appropriate mitigation measures." 40 CFR § 1502.14; Robertson v. Methow Valley Citizens Council, 490 U.S. at 352-53 ["omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA"]. Finally, the EIS must examine a reasonable range of alternatives to the proposed action, and focus on those that reduce the identified impacts of that action. 42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1. So important is the alternatives analysis that the Council on Environmental Quality (CEQ) regulations describe it as the "heart" of the EIS. 40 CFR § 1502.14. These same regulations require the agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 CFR § 1502.14(a).

28

58.     NEPA requires every major federal action affecting the environment to issue an EIS which contains a "Purpose and Need" section explaining the reasons for taking the action. So far, there have been more than a dozen Draft or Final EISs issued for Atlantic coast OSW projects. Each of them, including the Atlantic Shore South FEIS, cites compliance with Executive Order (EO) 14008 as the primary justification for the project. Every Record of Decision (ROD) for offshore wind projects, including the ROD for Atlantic Shores South, cites EO 14008 as grounds for its purpose and need. Therefore, it is clear that the Atlantic Shores South project is only one element of an integrated plan to construct multiple wind energy facilities up and down the Atlantic Coast of the U.S. in order to deploy 30 Gigawatts (30,000 MW) of offshore wind by 2030.

59.     BOEM has violated NEPA and its implementing regulations by issuing a ROD for the Atlantic Shores South project and by approving the Final EIS for the Project, despite the Final EIS's procedural and substantive defects. 42 U.S.C. § 4331, et seq; 40 CFR § 1500, et seq.  The Final EIS, and the ROD that formalized its approval, are arbitrary and capricious and otherwise not in accordance with the law in violation of 5 U.S.C. § 706.

60.     An EIS must provide a detailed statement of: (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources that would be involved in the action should it be implemented.  42 U.S.C. § 4332(C).  An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 CFR § 1502.1.  NEPA also requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative

29

impacts of the proposed action and to take a hard look at those impacts. 40 CFR §§ 1508.7, 1508.8. In addition, NEPA requires federal agencies to consider mitigation measures to minimize the environmental impacts of a proposed action. 40 CFR § 1502.14 (alternatives and mitigation measures); 40 CFR § 1502.16 (environmental consequences and mitigation measures).

61. The ROD and Final EIS that BOEM prepared and approved for the Atlantic Shores South project failed to comply with each of these NEPA requirements. The Final EIS does not analyze an adequate range of turbine location, number or size alternatives that are environmentally distinct. By summarily dismissing the no action alternative as not meeting vague programmatic goals, the EIS essentially contains no real alternatives to the project's proposal. Nor does it adequately analyze the Project's impacts on the human and natural environment, as discussed in Plaintiffs' comment letters to BOEM and as set forth in this Complaint. The Final EIS also fails to consider mitigation measures capable of reducing the action's impacts on human and natural resources and relies on outdated, inaccurate, incomplete, and inadequate information when assessing the impacts of the proposed action.

62. The final EIS failed to provide impact information essential to make any reasoned decision on project approval or disapproval, including that for underwater noise impact from turbine operation on whale migration, the feasibility of turbine removal and onshore processing, airborne noise from pile driving and turbine operation, on the right whale's food source (copepods) and the humpback whale's food source (menhaden), the cause of the recent whale and dolphin deaths, turbine component failures and consequences from normal operation and windstorms, the project's effect on climate change, greenhouse house gas emission changes on a regional (transmission grid) scale, protection of now submerged ancient archeologic artifacts, military radar interference, and business losses from higher electric rates.

30

63.    For each of the reasons set forth above, BOEM's adoption of the ROD and Final EIS for the Atlantic Shores South project was arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)). And as such, Plaintiffs SLBI, Dr. Robert Stern, Captain Alan Shinn, and Captain Mike Young have been harmed.

**Second Cause of Action**
**Violation of Endangered Species Act and Administrative Procedures Act**

64.    Plaintiffs reallege and incorporate by reference all of their previous allegations, and further allege as follows:

65.    The ESA's guiding purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species . . ." 16 USCS § 1531(b).

66.    It is further stipulated under the ESA that "federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 USCS § 1531(c)(1).

67.    It is ostensible that Congress's intent in passing the ESA is to "halt and reverse the trend toward species extinction -- whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978). "This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.*[7]

_____

[7] "One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies 'to ensure that actions authorized, funded, or carried out by them do not jeopardize the continued existence' of an endangered species or 'result in the destruction or modification of habitat of such species . . . .' 16 U. S. C. § 1536. This language admits of no exception." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536 (1976)).

68.    Agency determinations under the ESA are reviewed pursuant to the APA, which requires that an agency action be "upheld unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. at 1247 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). However, as enunciated in *Conservation Cong. v. United States Forest Serv.*, 720 F.3d 1048 (9th Cir. 2013), an agency action is arbitrary and capricious if it, "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise (emphasis added)." Id. at 1054.

69.    Section 7(a)(2) (16 U.S.C. § 1536(a)(2)) of the ESA provides that the "Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . ."

70.    Pursuant to the ESA's stipulations in 16 USCS § 1536(a)(2), agencies must utilize the "best scientific and commercial data available" in determining that an agency action will not jeopardize the continued existence of any endangered species or threatened species. This "best data available" stipulation obviates an agency from "disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006).

71.    The agency must "not ignore available biological information." *Id.* at 1080-81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); accord *San Luis & Delta-*

32

*Mendota Water Authority v. Badgley*, 136 F. Supp. 2d 1136, 2000 WL 33174414, 10-11 (E.D. Cal. 2000); *Pacific Coast Federation of Fishermen's Ass'n v. National Marine Fisheries Service*, 71 F. Supp. 2d 1063, 1073 (W.D. Wash. 1999).

72.    If those challenging the agencies can identify relevant data not considered, then the presumption that agencies have employed the best available is repudiated. *Kandra v. United States*, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001)  (citing *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 985 (9th Cir. 1985). Moreover, a BiOp is arbitrary and capricious in contravention of the ESA if it "fails to consider the relevant factors and articulate a rational connection between the facts found and the choice made." *Ctr. for Biological Diversity v. United States BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012) (citing *Pac. Coast Fed'n of Fishermen's Ass'ns*, 265 F.3d at 1034 (9th Cir. 2001) (quoting *Natural Res. Def. Council v. U.S. Dep't of the Interior,* 113 F.3d 1121, 1124 (9th Cir. 1997))).

73.    The ESA says that take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct," with harm defined by regulation (50 C.F.R. §222.102) as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding, or sheltering." See also, 50 CFR 17.3.

74.    The NMFS' determination that the Atlantic Shores project does not jeopardize the North Atlantic right whale and its decision to authorize 20 NARW Level B takes is not based on the best available science and is  arbitrary, capricious, and otherwise contrary to law.

75.    Moreover, NMFS' determination in its Incidental Take Statement that 20 NARW would be taken via Level B take (harassment) is significantly underestimated and such

33

determination is arbitrary, capricious, and otherwise contrary to law. Further, the finding of 20

NARW takes is incongruous with the MMPA ITA which provides for 33 NARW takes.

76.     NMFS' determination that the project would not induce any Level A takes

(harm/injury)[8] of NARW is arbitrary, capricious, and otherwise contrary to law.

_____

[8] Important background on noise, and Level A/B takes for the Court from Dr. Robert Stern of SLBI (to be reproduced in a forthcoming Declaration): The impact on marine mammals from a noise source logically depends on the intensity of that source, the distance or range required for that source to decrease to desired levels, the presence of marine mammals in the elevated noise area, and how they react to it. Such calculations involve noise levels expressed in the decibel (dB) scale. The decibel scale is an exponential one whereby an increase of 10 dB, e.g., from 200 to 210 dB means that the noise intensity or energy has increased 10 times from what it was before, not by 5 percent. So relatively small changes in decibels on our human counting scale can have major impact on a whale. Relatively small changes in any of those dB numbers can mean very large changes in the elevated noise range and the number of animals affected. For example, for vessel surveys, with a source level minus desired level of 51 dB the change in transmission loss rate from 20 dB, used by the defendants, to 15 dB, results in an increased range of elevated noise **seven times** what it was before. For pile driving, a reduction in source level of 10 dB means that the elevated noise range is now only one-third of what it was, and since in this case, the area affected is roughly circular, that area and the number of animals affected are now just one ninth of what it was without that 10 dB reduction. Therefore, these factors, their disclosure and their scientific justification are critical to the credibility of the defendant's analysis.

The defendants calculations of Level A (instances of harm or fatality) and Level B "Takes" (instances of disturbance- potentially leading to worse outcomes) are also highly dependent on the assumption of a new much reduced presence of the right whale in the project area, for vessel surveys a high and unexplained sound pressure level transmission loss rate, for pile driving a high and unexplained sound energy level transmission loss rate, and the down-weighting of the hearing sensitivity of baleen whales, like the NARW, to the low frequency noise omitted here by the pile driving, and the failure to use a realistic probabilistic approach for estimating level B disturbance levels for impulsive noise criteria, that was included in the Jasco Applied Science noise exposure modeling but not in the Biological Opinion. The combined and cumulative effect of the use of scientifically unsupported and overly optimistic dB factors at multiple steps in the calculations supporting the BiOp and the ITAs have resulted in Take numbers that are significantly underestimated and unrealistic given the extraordinary quantity of noise energy being pumped into the ocean from these projects.

The calculation of level A and level B Takes is through a multiplication of the elevated noise area (the "ensonified" area derived from the exposure range) times the animal density in that area, and in the case of level A Takes times the added effect of auditory weighting upon the whale's hearing. Therefore, underestimates at each stage get compounded in the calculation. For level B takes from vessel surveys, plaintiffs show a 16-fold decrease in ensonified area and a tenfold decrease in

77.     Both BOEM and NMFS failed to ensure that the Atlantic Shores project would not jeopardize the survival of federally-listed species, such as the NARW, and failing to avoid jeopardizing the continued existence of the NARW.

78.     The BiOp NMFS prepared for the Atlantic Shores project is analytically deficient and not supported by the best available scientific data. By approving the Atlantic Shores project, BOEM violated the procedural and substantive requirements of the ESA. By issuing a defective BiOp, NMFS violated the procedural and substantive requirements of the ESA. And by relying upon the defective BiOp, BOEM violated the ESA. "Arbitrarily and capriciously relying on a faulty Biological Opinion violates this duty." *Defenders of Wildlife v. United States EPA*, 420 F.3d 946, 976 (9th Cir. 2005).

79.     The BiOp entirely ignores and fails to analyze the statistically anomalous increase in whale strandings in the NJ/NY Bight from late 2022-through 2023. The BiOp further ignores the comment and letter submissions by SLBI which contained charts and figures depicting the high spatiotemporal relationship between strandings and marine site characterization activities in the NJ/NY Bight.

80.     The BiOp fails to consider that there is no independent verification of the modelling, noise dissipation factors, auditory functions, or generally, the noise modelling, associated with Atlantic Shores' project in any phase of its development. It fails to explain why the

---

animal density for the NARW for a combined 160- fold underestimate. For level B Takes from pile driving, plaintiffs show a 5-fold decrease due to the failure to use realistic disturbance threshold criteria and the tenfold decrease in NARW density for a combined 50-fold underestimate. For level A Takes from pile driving it appears there is an 81-fold underestimate in ensonified area and an additional 2-fold underestimate due to the use of the auditory weighting functions for a combined 162- fold underestimate. Therefore, the level A and level B Take estimates up upon which the BiOp conclusions are based are severely underestimated, not based on the best science available, nor in any way conservative which the Act calls for.

sound field verification measurements for vessel surveys that were required in the Atlantic Shores lease were never disclosed.

81.    The BiOp presents results of opaque computer models, but provides no cogent physical or scientific explanation of how the extraordinary degree of noise energy transmitted to the sea will not cause the permanent hearing loss to a single NARW from cumulative sound energy exposure due to pile driving.

82.    The BiOp concludes but provides no reasoned explanation as to why no permanent hearing loss from cumulative sound energy exposure will occur to an animal from a survey vessel.

83.    The BiOp does not include a critical measure that it does require for offshore wind shallow hazard surveys for offshore oil and gas development. NOAA authorizations for Gulf of Mexico surveys require survey shutdowns in the event of a live stranding or near shore atypical milling of marine mammals within 50 kilometers of the survey operations, and potential investigations if "NMFS determines that the circumstances of any marine mammal stranding found in the vicinity of the activity suggest investigation of the association with survey activities is warranted"           (https://www.fisheries.noaa.gov/s3/2023-08/ExxonMobil-GOMLOA-LOA-OPR1.pdf, p. 12 of 14). This BiOp therefore applies an arbitrary double standard for offshore wind versus oil and gas development, even though the noise emanating from the devices used in the horizontal direction where most of the animals are, are similar.

84.    The BiOp relies on the Biological Assessment (BA) and supporting Jasco Applied Sciences Reports which name several computer models used and what they calculate but provides no information whatsoever on the inner workings of these computer models, their equations, the inputs used, their physical assumptions, and whether those are consistent with mainstream science and accepted practice.

36

85.    With respect to sound exposure modeling, the BA and BiOp do not provide the maximum broadband source pressure levels and frequency distributions asked for on page 5 of the BOEM Pile Driving Recommendations document.

86.    The BA and BiOp do not provide the sound pressure transmission loss and attenuation coefficient factors requested in the BOEM Pile Driving Recommendations Document.

87.    The BiOp presents results of opaque computer models, but provides no cogent physical or scientific explanation of how the extraordinary degree of noise energy transmitted to the sea will not cause the permanent hearing loss to a single NARW, from cumulative sound energy exposure due to pile driving. Straightforward calculations by Save LBI show that permanent hearing loss is likely to occur to numerous NARW traveling proximate to the pile driving sites. A good part of this exposure comes during the time it takes for this relatively slow-moving whale to pass the pile driving zone. The BiOp acknowledges that this time exposure can occur on page 216, but doesn't explain whether or how it accounts for it in its harm and fatality calculations.

88.    The BiOp relies on an animal movement model, the Jasco Animal Simulation Including Noise Exposure (Jasmine) Model to determine exposure ranges on a species-specific basis. The assumptions being made in that model are especially critical to the calculation of the range of level A (serious harm and fatality) takes involving cumulative noise energy exposure, which are highly dependent on the speed and the way the animal moves. Such behavior is subject to extreme uncertainty, but nowhere in the BiOp are the assumptions regarding that behavior, their uncertainty, or the scientific basis for them disclosed.

89.    Similarly, the BiOp and its supporting Reports provides no scientific basis for the very high 20 dB transmission noise loss factor being used in the calculations of exposure range and takes for vessel surveys. Physically, such a loss rate can only occur while the noise is spreading

37

out semi-spherically from its near surface source until it hits the seabed, i.e., for distances about equal to water depth, but not beyond as the BiOp assumes.

90.     The BiOp does not include a cumulative wind project assessment in the NJ/NY Bight area of the significantly increased operational turbine noise impacts from these large gearbox turbines, which will likely block the migration of the NARW, as well as fin and humpback whales that frequent the leased area.

91.     The BiOp does not include a numerical Level A assessment of the serious harm and fatality that can occur to NARW from Level B disturbances of its behavior, which are expected to significantly impair its navigation and communication capabilities.

92.     The BiOp does not examine or discuss how the substantial number of Level B takes will affect the NARW's population dynamics, recovery, survival, maintenance of population, or whether the Level B takes will potentially jeopardize its existence. The BiOp grossly underestimates the impact of Level B harassment on the vitality and survival of NARW. It presumes that no serious or fatal outcomes will eventuate from Level B harassment. Disturbance of whale behavior can result any number of undesirable outcomes, including loss of navigational capability and possible stranding, of communication between, for example, mothers and calves, potentially leading to the death of the calf , of the ability to detect prey potentially leaving to malnutrition or fatality, of the ability to detect predators, causing surfacing and becoming more vulnerable to vessel strike and causing stress potentially harming the animal in ways we do not even understand. It's thus unreasonable to assume no outcomes of harm or fatality will occur to marine mammals from disturbance events. This is a major defect.

93.     The BiOp grossly underestimates, by a factor of ten, the impact to the NARW through the use of a very recent, unexplained density model for the right whale now conveniently

showing that the whales will not migrate in or near the project lease area, but rather much farther out to sea. The new, very low NARW densities used in the BiOp deviate from the higher numbers in Atlantic Shores' own recent application for the MMPA ITA rulemaking and the recommendations of the Duke University laboratory (which compiles the density numbers), not to use them, but to use the higher numbers in its previous reports for management purposes).

94.    All aspects of the BiOp's putative mitigation protocols exhibit deficiencies, including vessel speed itself, vessel speed restrictions, exemptions, soft-starts, protected species observers, passive acoustic monitoring, and seasonality restrictions.

95.    The BiOp includes abrupt, unexplained changes in modeled "Take" number results that appear to be the result of arbitrary changes in model inputs from one noise modeling report to another.

96.    The BiOp uses an unproven unverified auditory weighting function for low frequency cetaceans, like the right whale, which asks us to believe that these whales, previously said to be "low frequency specialists," no longer hear well at the low frequency noise prominent from pile-driving and turbine operation, even though the whale has vocalized at those frequencies for centuries and presumably received responses to its calls.

97.    The BiOp does not use the more reasonable probabilistic, impulsive "Wood et al." noise criteria for level B harassment disturbance, that is supported by observational studies and which would significantly increase the number of Level B takes for pile driving, even though those were included in the JASCO Applied Sciences noise exposure modelling report. Rather, it uses a single scientifically unsupported value for disturbance, below which there is none.

98.    For marine site characterization surveys, the BiOp uses technically unsupported low noise source levels for the sparker units, taken from a smaller "surrogate" device as opposed

39

to actual measurements of the sparker devices which are controlling in terms of the affected distance.

99.    The BiOp incorrectly uses a scientifically unsupportable and high 20 dB noise transmission loss rate for vessel survey / marine site characterization everywhere, even though the spherical noise spreading it represents only exists from the vessel out to seabed depth distances. Use of the proper measured device noise source level and the 15-decibel transmission loss rate which the NMFS has used previously extends the elevated ranges from 0.1 to 1.6 miles, and the number of animals affected significantly. That rate of 15 dB properly represents the transition from geometric spherical noise spreading to cylindrical noise spreading in between the seabed and surface appropriate for vessel survey noise distances. The 15 dB loss factor has been confirmed by sound field verification (SFV) measurements at the Vineyard Wind 1  project. In the final SFV report dated April 21, 2024  by Jasco  Applied Sciences. measurements taken at various distances from the pile driving of twelve monopile  foundations were displayed. At the near-field distances relevant to vessel survey noise out to approximately 2000  meters, nine of those measurements showed a 15 dB loss factor, one showed a 14 dB loss factor and two showed a 17 dB loss factor (Figures A-12, 24, 35, 48, 58, 70, 94, 106, 116, 128, 140, and 152). The 15 dB factor is distinctly different from higher loss rates appropriate to pile driving noise that can occur at farther distances, from both noise spreading and another mechanism - seabed attenuation.

100.    The IHAs do not use the Wood probabilistic criteria for impulsive noise from the vessel surveys which would result in higher level B takes; and therefore, are inconsistent with the JASCO reports for impulsive pile driving that do use them. This inconsistency is not explained.

40

101.    The BiOp fails to consider the robust correlations spatially and temporally between the IHA vessel surveys and whale mortalities. See below graphics denoting same.

**Vessel Surveys & Whale Deaths**



102.    The BiOp failed to consider the innumerable global whale and dolphin stranding events spatiotemporally correlated with the usage of sounding devices, for example, air guns, which have close similarities to the Dura Spark units utilized in the NJ/NY Bight for the IHA vessel marine site characterization surveys. While air guns direct a large amount of energy downward, the horizontal energy affecting most of the animals emanated by air guns and dura spark units is very similar in magnitude (both around 200-220 dB). The air guns have been noted frequently in other studies demonstrating correlations between whale deaths and sound devices. As such, the dura spark units used in vessel surveys are quite comparable to the units which have caused numerous whale strandings globally. See below images.

41



103.    The BiOp does not present the clear temporal trend showing increasing whale deaths with the number of vessel surveys. There as shown in the images below. The anomaly in the second figure for the years 2021 and 2022 was due to fewer vessels actually being deployed than were authorized.







- *Active Vessel Authorizations annually on paper during Covid 2021 although CDC placed restrictions on Vessel Control Actions USCG LMN 1/2021
- Source: North East Ocean Data, NOAA New England/Mid-Atlantic AMSEAS Report
- Whale Deaths annually: Humpback, Sperm, Minke, Baleen, Fin
- Dolphin Deaths in NJ for 2023: Bottlenose, Common, Porpoise
- Data as of 11/2/2023

104.    The BiOp does not provide the number of estimated vessel miles traveled. It only provides vessel trips, which does not disclose the length of those trips. The length of the trips more accurately serves to assess the risk posed to whales and other marine mammals. As such, a complete analysis on vessel strike risk to NARWs and other listed species cannot be conducted.

105.    The BiOp underestimates, under-analyzes, and/or underreports the impacts of

vessel strikes on NARWs and other listed species.

106.    The BiOp does not consider that turbine placement in this project area and in the other nearby but farther out areas in the New York Bight will leave a narrow Coast Guard designated 11-mile-wide vessel lane between the wind projects for commercial and military vessel traffic to pass through, but which also happens to be a primary migration corridor for the NARW. A whale attempting to pass through this corridor will be faced with high turbine operation noise levels from both sides, disorienting it while having significant vessel traffic bearing down on it. This is a major defect in interagency planning and with the BiOp itself.

107.    The BiOp erroneously characterizes the seasonality perturbations of the NARW. For example, on p. 122-23, it cites information that indicates certain NARW densities per month. This data ignores the fact that NARW have been increasing in densities farther south during the summer and autumn months.[9]

108.    The BiOp fails to cite, analyze or otherwise use or consider (pursuant to ESA regulations) the salient data related to the NARWs' birth rates, death rates, and calving rates. It fails to cite or discuss the 7.6-year calving rate. Further, detected NARW mortalities outnumber births 3:2.[10]

109.    Likewise, the BiOp contains no analysis of the fact that the population dynamics of the NARW have altered significantly, and that the potential biological removal threshold for NARW has dropped to 0.8.

110.    The BiOp contains no analysis of the fact that approximately 48 NARW have died

---

[9] Quintana-Rizzo, et al., "Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA" Endangered Species Research, Vol. 45: 251-268 (2021) ("Quintana-Rizzo").
[10] Id.

in entanglements 2010-18, and that deaths recorded are only 36% of actual deaths, per a study commissioned by the NMFS.[11]

111. Given crew transfer vessels ("CTV") comprise most of the trips, it constitutes a major error to exempt CTVs from the 10-knot speed limit.

112. The BiOp states, "North Atlantic right whales resilience to future perturbations affecting health, reproduction, and survival is expected to be very low," but yet does not analyze this fact in its jeopardy assessment.

113. The BiOp's reasonable and prudent measures feature very little analysis on prevention of vessel strikes.

114. The BiOp does not account for the potential of subsurface vessel strikes on marine mammals or NARWs in the take or jeopardy analysis.

115. The BiOp does not conduct a cumulative analysis of the impact of offshore wind energy on the NARW; it does not treat the BOEM lease areas in the NY/NJ Bight region as a synergistic unit. For example, the other BOEM lease areas in the NY/NJ Bight include Attentive Energy, Empire Offshore Wind, Vineyard Mid-Atlantic LLC, Bluepoint Wind LLC, Community Offshore Wind LLC, and Invenergy Wind Offshore LLC.

116. The BiOp does not conduct a cumulative Level B and Level A harassment take assessment for any phase of the project. The BiOp does not consider the cumulative effects of

---

[11] Richard M. Pace et al., Cryptic Mortality of North Atlantic Right Whales, 3 Conservation Sci. and Practice 1, 6 (2021), "We used an abundance estimation model to derive estimates of cryptic mortality for North Atlantic right whales and found that observed carcasses accounted for only 36% of all estimated death during 1990–2017 [emphasis added]." Study commissioned by NMFS.

HRG surveys on NARWs. The BiOp does not consider the cumulative effects of pile driving on entanglement risks or vessel strikes.

117. The BiOp does not consider the cumulative effects of all of the operational noise which will emanate outward from all of these proposed projects, likely blocking the NARW migration corridor in the NJ/NY Bight.

118. The BiOp does not consider the very real possibility of pile driving (or operational) noise compelling NARW into harm toward vessel strikes or entanglements. The Atlantic Shores project is only considered in isolation and not adjunctively with the other BOEM lease areas. No modelling is conducted in terms of cumulative risk posed by all of the projects. These are fatal errors which render the BiOp arbitrary and capricious.

**Pile Driving and Putative Mitigations**

119. The agencies assumptions as to the impact of pile driving on NARWs are fallacious in a plethora of ways.

120. All aspects of the BiOp's putative mitigation protocols exhibit deficiencies, including vessel speed itself, vessel speed restrictions, exemptions, soft-starts, protected species observers, passive acoustic monitoring, and seasonality restrictions.

121. The BiOp's reliance on soft-starts as a mitigation technique is erroneous. The BiOp asserts that soft-starts will likely reduce Level A and B noise exposure to NARW and whales, but yet, the take numbers are unadjusted, due to low confidence in efficacy.

122. The BiOp's litany of exceptions to the project vessels' 10-knot speed limit are so innumerable as to render such exceptions meaningless.

123. Between May and September, vessels are permitted to travel at speeds greater than 10 knots, and only protected species observers (PSOs) are employed as a mitigation protocol.

124. The 10-knot speed restriction only applies to vessels 65 ft. or larger, and that speed is a stronger determinant than size for NARW impact, why does the 10-knot rule exempt smaller vessels? The crew transfer vessels frequently transiting the wind development area are permitted to travel greater than 10-knots.

125. In the BiOp, NMFS continues to assume an unsupported 10 dB pile driving noise source loss attenuation from bubble curtains or similar system. This assumption is not valid for the large diameter foundation here and the low frequency noise generated by the pile driving of it. Among other reasons, the pile driving of the larger turbines generates more energy at lower frequencies, and much of the lower frequency noise energy is transmitted down the foundation into the seabed where it then travels, bypassing the bubble curtains, and emerges back into the water column downstream. Therefore, these systems are inherently limited for the low frequency noise dominating the pile driving noise. The low frequency noise requires larger bubbles to contain it, which are inherently difficult to sustain in the ocean environment. BOEM staff have stated in briefing material that these systems are ineffective for frequencies less than 200 Hertz. The "Bellman" report itself, which the BiOp often references, recommends that for these larger foundation diameters and higher energy pile driving operations, noise reduction should be focused on reducing the pile driving energy itself and not rely on secondary bubble curtain or similar systems. The low take estimates in the BiOp, in particular the Level A Take estimate for the NARW less than 1, rely on this scientifically unsupported 10 decibel source attenuation assumption, and are therefore not valid.

126. Their assumption that the adverse impacts from pile driving will be insufficient to kill any whales or jeopardize the continuing existence of NARW, completely ignores the immense amount of noise energy injected into the waters. Noise is the sine qua non of a whale's existence,

47

as spatial orientation, navigation, communication, etc., is all influenced by hearing/noise. The agencies significantly underestimate the impact of noise from pile driving on the NARW.

127.    The turbine foundation installation "days" are underestimated. The Atlantic Shores permitting management company, Epsilon Associates, in connection with the company's OCS air permit application, has stated that it requires 2.6 days to complete a full foundation installation. This presumes that the wind turbine installation vessel (WTIV) will have to be at one location for more than the one day that the BiOp relied-on JASCO Noise Exposure Modeling reports assume to drive one pile, before it can move to the next location. Therefore, pile driving will need to extend into December when the NARW is still migrating and also into a 3rd year invalidating the construction scheduling  assumptions in the BA and BiOp, and further clouding the take estimates.

128.    The NARW densities are far too low, just a tenth of what they were just a year ago and underrepresent the presence of NARW in the NY/NJ Bight offshore waters. The new very low NARW densities used in the BiOp are counter to those in the company's own recent application for the MMPA ITA rulemaking and to the recommendations of the Duke University laboratory that compiles these density numbers, not to use them, but to use the higher numbers in its previous reports for "management purposes". This significantly underestimates both Level A and B takes by up to a factor of 10.

129.    The assumption that 160 decibels ("dB") is the threshold over which the NARW's behavioral reaction to impulsive noise will occur neglects to use the reasoned probability of response approach from Wood et.al. based on whale observation that was included in the Jasco noise exposure modeling reports, but was excluded from the BiOp without explanation. The probability approach would exponentially increase the region of auditory weighted 140+ dB noise,

such that even adjusting for the uncertain and unverified weighting functions in the JASCO Reports, and assuming a uniform animal density, the number of Level B takes would increase by 5 times using the Wood probability criteria.

130. The agencies presume the use of a mitigation technique, "bubble curtains" will substantially reduce the noise impact to NARW. However, bubble curtains will not weaken noise less than 200 Hertz ("Hz") in frequency, which constitutes the predominant pile driving noise. This is important because NARW, a low frequency cetacean, hears in a large portion of the frequency not attenuated by bubble curtains.

131. The BiOp makes a fatal error when it neglects to translate any of the Level B harassment takes into Level A takes. It fails to include numerical Level A takes of the serious harm and fatality that can eventuate from Level B disturbance, which significantly impair the whale's navigation and communication.

132. The BiOp conclusion on page 221 that disturbance of the whale will "not actually kill or injure any right whales by significantly impairing any essential behavioral patterns" because it "will be limited to that single day and are expected to be fully recoverable" is not valid because it does not account for serious harm or fatality that can occur in that same day from loss of navigational capability and stranding, greater susceptibility to vessel strike, or from separation of mothers and calves. Nor does it justify that all disturbance will be fully recoverable in one day.

133. The Level A take exposure range for the NARW and the number of Level A takes in the BiOp are inconsistent with the calculation method described and are significantly underestimated.[12]

---

[12] The discussion in the BiOp of how the exposure range for a Level A Permanent Threshold Hearing loss was calculated does not lead to the number of 0.72 kilometers in Table 7.1.8. The BiOp states on page 192 that the exposure range was calculated assuming an animal stayed there

134.    For Level A takes, the Jasco reports used two unverified and scientifically unsupported auditory weighting functions allegedly to represent the whale's hearing sensitivity at various frequencies in its calculation. Based on a comparison of the exposure ranges for the unweighted and auditory weighted calculations in the JASCO Tables F6 through F12 of its August 10th Report, eliminating the use of the auditory weighting function would increase the range to get to 138 dB from 9 to 12 km, increasing a circular ensonified area 144-fold compared to the BiOp range and **increasing the Level A takes to 20 (144 X 0.14)**. The use of these weighting functions has the effect of concluding that the NARW no longer hears well at low frequencies. This is a conclusion that is antithetical to the available evidence.

135.    The revised higher estimates for NARW Level A takes above are based on the distances to reach the 138 dB level found in the Jasco Noise Exposure Modeling Reports relied on by the BiOp. However, even those distances are underestimated because they rely on an unusually high and unexplained 30 dB sound energy level (SEL) and 35 dB sound pressure level (SPL) noise transmission loss factors.

136.    The recent BOEM Nationwide Recommendations for Impact Pile Driving, Sound Exposure Modeling and Sound Field Measurement for offshore wind construction and Operation

---

for the full pile driving duration to reach the accumulated energy criteria of 183 dB. It states on page 167 that the pile driving duration is 7 to 9 hours so the time spent contribution to the accumulated energy would be 10 times the log of 9×3600 or 45 dB. That would mean that the one second sound energy level at the 0.72 km point would have to be 183 minus 45 dB or 138 dB. However, Tables F.6 through F.12 in the August 10th Jasco Applied Sciences modeling reports even assuming the 10 dB source reduction and auditory weighting show that it would require a distance of about 9 km to decrease to 138 dB. **This requires clarification as a 81+ fold increase in ensonified area (assumed circular) would increase the <u>Level A Take number for the NARW of 0.14 in Table 7.1.13 to 11</u>, well above the biologic removal rate.**

Plans of August, 2023, presents the noise transmission loss (TL) with distance by the equation.[13] The noise exposure modeling reports supporting the BiOp have not disclosed the factors being used as asked for in the BOEM Pile Driving Document, but presumably have accounted for both spreading loss and attenuation. For a hammer operating at 4,000 kilojoules, Table F-11 in Appendix B of the Jasco August 10, 2022 Report shows a transmission loss in sound exposure level (SEL) from 1 to 10 km of about 30 dB. Similar losses occur for other energies. That is unusually high compared to actual measurements as shown below from the Report by Rand Acoustics, Inc. titled Pile Driving Noise Survey, Technical Report of March 28, 2024.

Measured Sound Exposure Level Transmission Loss[14]



137.     The Rand Report SEL measurements show a transmission loss of at most 17.4 dB going from 1 to 10 kilometers, much less than the 30 dB in the noise modeling reports relied on by the BiOp. Subtracting a conservative 15 dB from that for noise spreading at greater distances,

---

[13] TL= F•log10(R) + a•R/1000, Where F is the noise spreading loss factor in dB, a is the attenuation loss factor in dB per kilometer, and R is the distance from the source in meters.

[14] Source: Rand Acoustics Pile Driving Noise Survey Technical Report. March 28, 2024. Figure 32. Sound exposure SEL values for all hammer blows acquired during the survey. The SEL values are calculated for the RMS, 90% levels and window width for each hammer blow. SEL source level (SL) is conservatively estimated for maximum values at each location.

51

the measurements already account for an attenuation factor of 0.27 dB per kilometer (2.4 dB divided by 9 km). The only possible explanation for such a high 30 dB loss factor would involve additional seabed attenuation of 1.40 dB per kilometer (the extra 12.6 dB divided by 9 kilometers) for a total attenuation factor of 1.67 dB per kilometer. Such a high attenuation level does not appear in the scientific literature. If such a high attenuation factor has been used the BiOp should have disclosed what factor it is using, and the physical and/or measurement basis for it.

138.    Even higher unexplained attenuation factors arise from the sound pressure level (SPL) data derived and relied on in the Jasco reports. Tables F-51 and F-52 of the Jasco August 10 th 2022 Report show a 35 dB decrease going from 1 to 10 kilometers. But the measured SPL result in the Rand Pile Driving Report, Figure 22 , shows a loss of only 17.5 dB. The attenuation factor needed here to account for the difference from noise spreading would have to be 20 dB/9 km or 2.2 dB per kilometer.

139.    Such high attenuation factors do not appear in the scientific literature. If such high attenuation factors have been used the BiOp should have disclosed what factors it is using, and the physical characteristics of the seabed and/or the measurements that justify its use. Absent that, the noise exposure modeling should be revisited using a lower attenuation factor more consistent with measurements, which would increase the ensonified ranges, area and Level A Takes above even more.[15]

---

[15] As shown in the SLBI technical report on the Impact of Operational Noise on the NARW [attached to ESA Notice of Intent to Sue Supplement, and to be used in forthcoming filings], based on actual measurements of sound loss off the New Jersey Continental Shelf reported in the study: Shallow Water Sound Transmission Measurements Taken on the New Jersey Continental Shelf, William M Carey et.al, Advanced Research Projects Agency, Arlington, VA, a seabed attenuation factor of 0.35 dB per kilometer factor can be derived, which may be the most reliable estimate because it is based on NJ specific measurements. SPL measurements taken at twelve pile driving locations at the Vineyard Wind 1 project out to distances of 10 kilometers were presented in the report titled Underwater Sound Field Verification Vineyard Wind 1 Final Report,

140.    The BiOp conclusion on page 221 that "no right whales will be injured or killed due to exposure to pile driving noise" is not supported by the numbers. The BiOp number of 0.14 Level A NARW Takes is only reached through a series of unsupported assumptions and faulty calculations, i.e., the 10 dB noise source attenuation, the high noise transmission loss rates, the low 0.72-kilometer exposure range, the new low NARW presence, and the use of unverified auditory weightings. With proper assumptions, the number of Level A NARW Takes is 11-20, or two orders of magnitude greater than that shown in the BiOp, clearly exceeding the right whale's biological removal rate and jeopardizing its continuing existence.[16]

141.    The BiOp relies upon mitigation protocols that insufficiently and ineffectively reduce the risk of harm to NARW, including bubble curtains, soft starts, passive acoustic monitoring ("PAM"), and visual spotters. These protocols largely form the predicate of the agencies determination of no Level A takes to NARW.

---

April 21, 2024, by Jasco Applied Sciences. The results were fitted to the formula in footnote 14 to derive the noise spreading loss and attenuation factors. In nine of those cases where the spreading loss was plausibly above 10 dB for cylindrical spreading, the attenuation factors ranged from a low of 0.02 to a high of 0.89. Other data on the seabed attenuation is sparse. The BOEM presents attenuation factors of 0.94 to 1.41 dB per kilometer for specific sites in Table 3-1 of its Report titled: Parametric Analysis and Sensitivity Study of the Acoustic Propagation for Renewable Energy. A higher value of 1.47 dB per kilometer was used by Dominion Energy for its site in its report of November 28, 2020 titled Coastal Virginia Offshore Wind Noise Monitoring during Mono-pile Installation without explanation. The Marine Mammal Commission cites a factor of 0.9 dB per kilometer in its letter to miss Jolie Harrison of March 2021 regarding the South Fork wind farm.

[16]  That range of Level A takes is consistent with Save LBI's independent estimates in its report titled Impact of Pile Driving Noise on the NARW, August 2024 [attached to ESA Notice of Intent to Sue Supplement, and to be used in forthcoming filings], using the approach of estimating - from the Jasco Report sound energy levels-the range from the pile driver that a whale passing by it would incur permanent threshold hearing damage, and then determining statistically how many migrating whales would enter within that range.

142.    The BiOp arbitrarily assumes that soft-starts will cause NARWs to leave the area temporarily.

143.    A study conducted by Compton, et al. (2008) demonstrated that some mammals may, paradoxically, be attracted – not repelled – by weaker sounds, thus exposed to potentially harmful sounds as the noise level increases.[17] Many other studies show that soft starts do not work and in fact are injurious to whales.

144.    In the BiOp, too much reliance is placed on visual spotter observation and passive acoustic monitoring devices to detect whale presence, and take mitigating actions, that are not supported by study results of their effectiveness. Three visual spotters cannot effectuate a 1900-meter visibility distance for the clearance and shutdown zones. A 10,000-meter Passive Acoustic Monitoring (PAM) monitoring zone would require tens of monitors continuously redeployed as the pile driving location moves. No such robust system is proposed, nor is the real-time nature of the system or the expertise of the operators.

145.    In 77 FR 50290, cited by NRDC v. Pritzker, 62 F. Supp. 3d 969 (N.D. Cal. 2014), the cited efficacies for passive acoustic monitoring ("PAM") and protected species observers ("PSO") are 25% and 9% respectively.

146.    PSOs are riddled with numerous limitations, including observer independence, bias, elevation of observation platform, weather conditions and visibility, opacity of the water, among other variables. These observers cannot effectively see beneath the surface of the water, and in terms of distance, the absolute "best" case scenario is observability out to 1-1.5km.

147.    The BiOp provides no basis for implementing a 1900-meter minimum visibility

---

[17] Compton, et al., A critical examination of worldwide guidelines for minimizing the disturbance to marine mammals during seismic surveys (2008), https://www.sciencedirect.com/science/article/abs/pii/S0308597X07000607

zone for the NARW. For PSOs, the probability of actually detecting a whale is above 50% **only** for distances less than approximately 500 meters. For the 1900-meter zone, it would require 9, not 3, visual spotters to properly cover the zone.

148.    Only 3 PSOs are required at a time for HRG surveying and pile driving. However, 3 PSOs is extremely diminutive given the expansive nature of the spatial domain covered, visibility, weather conditions, obscurity of water, height of observation platform, and possible observer bias.

149.    The BiOp does not exclude overnight HRG surveying or pile driving. How can the already very low efficacy of PSOs be maintained overnight?

150.    The BiOp admits: "Large whales also do not have to be at the water's surface to be struck." Yet, the PSOs have little to no efficacy in detecting sub-surface whales.

151.    PAM is only reasonably effective at 500 meters or less.  The 10,000-meter monitoring zone would require innumerable PAM monitors, continuously being redeployed as the pile driving location moves.

152.    PAM's limitations are extensive, i.e., "it requires that the animals produce sounds . . . [and] it requires those sounds to be of sufficient amplitude to be detected at the monitoring location.' The 'received levels of the biological sounds [also must] exceed background noise and other measurement noise. . .'" Native Village of Chickaloon v. Nat'l Marine Fisheries Serv., 947 F. Supp. 2d 1031, 1043-44 (D. Alaska 2013).

153.    Based upon those Save LBI transparent and scientifically supportable calculations shown in Table 3 of its Report on Pile Driving Impact, using the sound energy level versus distance numbers in the August 10 Jasco Noise Expose Modeling Report and observed swim speeds for the NARW from a published study, and even assuming the 10 dB source attenuation And the auditory

weighting, a whale passing within 3.7 miles of miles of a pile driving operation will accumulate enough sound energy to suffer permit hearing loss. Considering its migration in December when pile driving is allowed and needed to maintain schedules 4 to 7 NARW will suffer Level A takes from pile driving, depending on the extent of night time construction, leading to permanent hearing loss. This estimate is fully consistent with the estimate of 11 level A Takes discussed earlier considering that the BiOp assumed that the whale was in the vicinity of the pile driver for 7 to 9 hours where the assumption here was that the whale was passing by the pile driver over a period of about 4 hours. Therefore, the estimate here of 4-7 Takes is about half of the 11 Level A Take estimate. Both estimates are contrary to the agencies' conclusion of no Level A takes and permanent hearing loss. Even the death of 4-7 NARW would far exceed the biological removal rate of 0.8.

154.    And contrary to the agencies' assumptions, this would certainly jeopardize the continuing existence of the NARW species, in contravention of the ESA.

**Operational Noise**

155.    The BiOp, ITA, and the final EIS fail to analyze the critical problem arising from the continuous noise generated by the operation of all the turbines in the wind complex. They fail to use the best available science contained in two studies of noise measurements showing a clear increasing linear decibel versus noise power trend for low to moderate power turbines from which a noise source level for a single Vesta-236 turbine to be used here can be reliably predicted. They failed to add to that single turbine source level the effect of the 200 turbines. Because the desired level for continuous noise to avoid disturbance is 120 dB or 40 dB less than that for impulsive noise, the difference between the wind complex source level and the desired level for operational noise, and thus the elevated noise range will be greater than that for pile driving and vessel surveys for which numerical analyses was done, but inexplicably no numerical analysis was done for

operational noise. Plaintiffs' calculations show that the cumulative project operational noise in the NJ/NY Bight areas will obstruct and potentially block the migration of the NARW and jeopardize its continuing existence making the failure to analyze this issue a major if not, the most egregious omission in the noise exposure modeling supporting the project approvals.[18]

156.    The BiOp fails to utilize the best available scientific evidence on operational noise, pile driving, entanglements, population baseline, recovery, and survival, and otherwise, all aspects of this Atlantic Shores project.

157.    The BiOp does not address the issue of operational turbine noise on the essential migration of the critically endangered North Atlantic right whale,  perhaps the worst impact of this project on marine mammals.

158.    The BiOp does not acknowledge that the primary migration corridor of that whale intersects and is adjacent to the project area as shown below.[19]

---

[18] Using the trend lines from the "Tougaard" study, the plaintiffs noise consultant, XI-Engineering, predicted a noise source level for a single 15-megawatt (MW) Vesta-236 turbine of 181 decibels (dB) for monopile foundations. Notwithstanding the defendant's insistence on citing lower noise levels for smaller turbines, the final EIS essentially confirms this higher level. On page 3.5.6–44, it states that: "Larger turbines do produce higher levels of operational noise, and the least squares fit of that dataset would predict that an SPL measured 328 feet (100 meters) from a hypothetical 15 MW turbine in operation in 22 mile per hour (10 meter per second) wind would be 125 dB re 1 µPa (Tougaard et al. 2020)." Backing that 125 dB number up from 100 meters to the source at 1 meter using the Tougaard transmission loss numbers results in a source level for a single turbine of 172.4 dB, getting closer to the plaintiff's 181 dB number. The Tougaard "dataset" was for all foundation types, had that least squares fit been done just for the monopile foundations to be used here, it would likely have duplicated the plaintiff's source level number.
[19] Atlantic Shores' MMPA ITA Application.



Right Whale Migration- from Atlantic Shores Incidental Take Application for Construction



159.    The BiOp does not consider the cumulative effects of all of the operational noise which will emanate outward from all of these proposed projects, likely blocking the NARW migration corridor in the NJ/NY Bight.

160.    The BiOp states without reference that the wind turbines for Atlantic Shores will use the newer direct drive technology, but the State approval of the project envisioned the use of the Vesta 236 15-megawatt turbine, which is a gearbox turbine. Therefore, the measured data showing significant increasing noise level versus turbine power for gearbox turbines on monopile foundations in the data used by Stober and Thompson are directly relevant to predicting the noise level of the larger turbines to be used here. And even if the project were to switch to the use of direct drive turbines, the BiOp assumes but has presented no evidence that the operational noise from large direct drive turbines is less than that for the large gearbox turbines.

161.    The BiOp incorrectly determined that Stober and Thomsen (2021)[20] is not

---

[20] Stober U, Thomsen F. 2021. How could operational underwater sound from future offshore wind turbines impact marine life? J Acoust Soc Am. 2021 Mar;149(3):1791. doi: 10.1121/10.0003760. PMID: 33765823

considered the best available scientific information on underwater noise likely to result from operation of 10 MW or larger turbines.

162. The BiOp arbitrarily utilizes the proxy of Block Island Wind Farm, consisting of only 5 much smaller turbines that generate much less noise to dismiss the Atlantic Shores' operational noise impacts.

163. The BiOp incorrectly concludes that Elliot et al. 2019 and HDR 2023 represent the best available data on operational noise that can be expected from the operation of the Atlantic Shores turbines. It misleadingly showed low measured noise levels from "two 12-megawatt" turbines, but failed to mention that those measurements were taken with those turbines operating at 6-megawatts, generating noise source intensity levels thousands of times less than the 15-megawatt turbines to be used here.

164. There is no route the whale could take within its historic migration range and avoid the 120+ dB noise disturbance levels, thus jeopardizing its migration and continuing existence.

165. There are no practical, observational mitigation measures that can be applied in an operational turbine setting.

166. For the Vesta 236, 15 MW turbines Atlantic Shores proposes, utilizing scientifically reliable noise source levels, in concert with measurement and other study noise transmission loss data and past agency practice on noise transmission loss, SLBI can robustly demonstrate that the zone of 120+ dB noise is much greater than anticipated by the agencies. 120 dB is significant as it represents the threshold over which the whale's behavior will be disturbed.

167. As it turns out, based on those calculations the 120+ dB zone extends 12 miles from the perimeters of the turbine projects in the NY/NJ Bight, and thus, the NARW's entire migration corridor in this Bight will be in danger of being completely obstructed by noise.

168.    The red lines overlayed on the BOEM wind lease areas below denote the 12-mile distances from the perimeters of the turbine projects, i.e., the region ensonified by disturbance level noise (120+ dB). The green line represents the NARW's historic migration range from shore. As such, the NARW's migration will be obstructed and potentially blocked by this noise.



169.    The agencies did not adequately consider the inimical impact of operational noise, and egregiously, fallaciously failed to consider the edifice of noise created from operational turbine noise.

170.    This is noise which is likely to obviate the NARW from migrating effectively through the NY/NJ Bight. It will be extremely difficult for the whales to avoid that expanse of elevated noise and continue their migration. Attempting to do so could expose them to high cumulative sound exposures and hearing loss, loss of communication between them, separation of females from calves, strandings, and loss of their navigational abilities.

171.    In the above and numerous other respects, the BiOp fails to utilize the best science

available, fails to consider critical data, and draws conclusions antithetical to the evidence before them. And as such, Plaintiffs SLBI, Dr. Robert Stern, Captain Alan Shinn, and Captain Mike Young, have all been harmed through violation of ESA and the APA (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)).

## Third Cause of Action
## Violation of Marine Mammal Protection Act and Administrative Procedures Act

172.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

173.    This cause of action challenges significant legal deficiencies, in the BiOp, Incidental Take Statement, and MMPA ITA of Atlantic Shores and Empire Wind.

174.    Pursuant to 16 USC 1373(a), the MMPA stipulates that, "the Secretary, on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission, shall prescribe such regulations with respect to the taking and importing of animals from each species of marine mammal . . ." The best scientific evidence available was not utilized in the agencies' analysis in the BiOp, Incidental Take Statement or MMPA.

175.    The primary purpose of the MMPA was to "establish a national policy to prevent marine mammal species and population stocks from declining beyond the point where they ceased to be significant functioning elements of the ecosystems of which they are a part."[21]

176.    The MMPA at 16 USC 1371(a) provides, "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any

---

[21] https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-policies-guidance-and-regulations

marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases . . .”

177.   The MMPA permits an exception to this general proscription, “ upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population if the Secretary finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock.” 16 USC 1371(a)(5)(A).

178.   As such, even within the exception, the MMPA countenances only the taking of ‘small numbers’ of marine mammals. “Take” within the meaning of the MMPA can mean Level A or Level B takes.

179.   Level A harassment is defined as, “has the potential to injure a marine mammal or marine mammal stock in the wild.” 16 USCS § 1362(18)(A)(i), 50 CFR 216.3.

180.   Level B harassment is defined as, “has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.” 16 USCS § 1362(18)(A)(ii), 50 CFR 216.3.

181.   The MMPA language does not address potential outcomes of harm and fatality resulting indirectly from animal disturbance as the ESA does (see supra). Additionally, as stated in NRDC, Inc. v. Pritzker, 828 F.3d 1125, Level A harassment involves activities that directly injure or are likely to injure marine mammals. By contrast, Level B harassment involves activities that interfere with normal behavioral patterns of the marine mammals, with the risk of indirect

harm that creates. To satisfy the requirements of both Acts, and for both Acts to be consistent, the Level B take analyses supporting the BiOp, the ITA, and the final EIS should have included a detailed assessment of the potential for animal harm and fatality resulting indirectly from level B disturbances.

182.    Since the definition of harm within "take" in the ESA includes behavioral and habitat disruptions that can lead to injury or death, the MMPA's Level B harassment take language, likewise, should include analyses on potential injury/death eventuating from disturbance. In 50 CFR 216.3, the MMPA regulations define Level B harassment as "any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild." Not only is this scientifically inaccurate (disturbance always has potential to cause injury or death), but it is incongruous with the definitions of "harm" and "take" in the ESA, which include the potential for injury and death.

183.    The Atlantic Shores MMPA  Letter of Authorization[22] seeks to take an impermissibly high number of marine mammals (see image below). First, it requests the 5-year take of 25 NARW total, which constitutes 7.0% of the NARW existing population.[23] This violates the MMPA as it constitutes greater than a small number of the NARW stock.

---

[22] https://www.fisheries.noaa.gov/s3/2024-10/ASOW-South-LOA-Issued-OPR1.pdf
[23] 356 individual NARW remaining. "In October 2023, NOAA Fisheries estimated that there were 356 (+7/-10) individual North Atlantic right whales remaining in the population as of 2022." https://www.fisheries.noaa.gov/species/north-atlantic-right-whale

**Table 1 – Maximum Annual and 5-year Total Take Authorized For the Atlantic Shores South Project, Incidental to All Specified Activities**

| Common Name | Scientific Name | Stock | Maximum Annual Take | | 5-year Total Take | |
|---|---|---|---|---|---|---|
| | | | Level A Harassment | Level B Harassment | Level A Harassment | Level B Harassment |
| *Order Artiodactyla – Cetacea – Superfamily Mysticeti (baleen whales)* | | | | | | |
| *Family Balaenidae* | | | | | | |
| North Atlantic right whale* | *Eubalaena glacialis* | Western Atlantic | 0 | 13 | 0 | 25 |
| *Family Balaenopteridae (rorquals)* | | | | | | |
| Fin whale* | *Balaenoptera physalus* | Western North Atlantic | 4 | 18 | 8 | 38 |
| Humpback whale | *Megaptera novaeangliae* | Gulf of Maine | 4 | 17 | 8 | 33 |
| Minke whale | *Balaenoptera acutorostrata* | Canadian Eastern Coastal | 17 | 161 | 29 | 321 |
| Sei whale* | *Balaenoptera borealis* | Nova Scotia | 2 | 11 | 3 | 25 |
| *Family Physeteridae* | | | | | | |
| Sperm whale* | *Physeter macrocephalus* | North Atlantic | 0 | 7 | 0 | 15 |
| *Family Delphinidae* | | | | | | |
| Atlantic spotted dolphin | *Stenella frontalis* | Western North Atlantic | 0 | 400 | 0 | 1,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Atlantic white-sided dolphin | *Lagenorhynchus acutus* | Western North Atlantic | 1 | 207 | 2 | 413 |
| Bottlenose dolphin | *Tursiops truncatus* | Western North Atlantic - Offshore | 0 | 3,836 | 0 | 8,153 |
| | | Northern Migratory Coastal | 0 | 1,949 | 0 | 3,087 |
| Common dolphin | *Delphinus delphis* | Western North Atlantic | 0 | 370 | 0 | 906 |
| Long-finned pilot whale | *Globicephala melas* | Western North Atlantic | 0 | 66 | 0 | 172 |
| Short-finned pilot whale | *Globicephala macrorhynchus* | Western North Atlantic | 0 | 20 | 0 | 52 |
| Risso's dolphin | *Grampus griseus* | Western North Atlantic | 2 | 110 | 3 | 280 |

184. Furthermore, as denoted in the above table, Atlantic Shores requests an

64

impermissibly high number of bottlenose dolphins, coastal and offshore. They request 13% of the offshore bottlenose dolphin stock over the 5-year period (8,153 requested takes / 62,851 = 13%).[24] For the northern migratory coastal bottlenose dolphin, they request 29.4% of the stock for the maximum annual take, and 46.5% of the stock total over the 5-year period.[25] . The take percentages for both of these species are substantial and contravene the small numbers limit of the MMPA.

185.    The MMPA small numbers provision is thus violated via the requested takes of NARW, coastal bottlenose dolphin, and offshore bottlenose dolphin.

186.    When combining the Atlantic Shores ITA with the existing Empire Wind ITA, the totals of taken marine mammals are event greater. Such a cumulative assessment of takes among various existing approval projects must occur pursuant to the MMPA regulations. The Empire Wind authorized takes[26] contravene the MMPA small numbers for Northern Migratory Coastal and Offshore bottlenose dolphins. When combining the annual takes of Atlantic Shores and Empire Wind, more than a legally permissible number of NARW are taken (29 Empire + 25 Atlantic Shores = 54, or 15.1% of the NARW stock).[27]

---

[24] Stock size (62,851)  for offshore bottlenose dolphin noted here, in Atlantic Shores' ITA Application: https://media.fisheries.noaa.gov/2022-09/AtlanticShoresOWF_2022_Application_OPR1.pdf.
[25] Id.  Stock size of 6,639.
[26] Page 35-37, https://www.fisheries.noaa.gov/s3/2024-02/EmpireWind-2024LOA-OPR1.pdf.
[27] NARW stock has decreased to 338.  https://www.fisheries.noaa.gov/s3/2023-08/North-Atlantic-Right-Whale-Western-Atlantic-2022.pdf

**Table 1 – Maximum Annual and 5-year Total Take Authorized For the Empire Wind Project Incidental to All Specified Activities**

| Common Name | Scientific Name | Stock | Maximum Annual Take | | 5-year Total Take | |
|---|---|---|---|---|---|---|
| | | | Level A Harassment | Level B Harassment | Level A Harassment | Level B Harassment |
| *Order Artiodactyla – Cetacea – Superfamily Mysticeti (baleen whales)* | | | | | | |
| *Family Balaenidae* | | | | | | |
| North Atlantic right whale* | *Eubalaena glacialis* | Western Atlantic | 0 | 13 | 0 | 29 |
| *Family Balaenopteridae (rorquals)* | | | | | | |
| Fin whale* | *Balaenoptera physalus* | Western North Atlantic | 4 | 136 | 6 | 201 |
| Humpback whale | *Megaptera novaeangliae* | Gulf of Maine | 0 | 63 | 0 | 97 |
| Minke whale | *Balaenoptera acutorostrata* | Canadian Eastern Coastal | 4 | 83 | 6 | 167 |
| Sei whale* | *Balaenoptera borealis* | Nova Scotia | 0 | 4 | 0 | 9 |
| *Family Physeteridae* | | | | | | |
| Sperm whale* | *Physeter macrocephalus* | North Atlantic | 0 | 3 | 0 | 6 |
| *Family Delphinidae* | | | | | | |
| Atlantic white-sided dolphin | *Lagenorhynchus acutus* | Western North Atlantic | 0 | 747 | 0 | 1,840 |
| Bottlenose dolphin | *Tursiops truncatus* | Western North Atlantic - Offshore | 0 | 1,800 (pile driving only) | 0 | 2,565 (pile driving only) |
| | | Northern Migratory Coastal | 0 | 1,185 (pile driving only) | 0 | 1,455 (pile driving only) |
| | | Northern Migratory Coastal and Western North Atlantic - Offshore | 0 | 2,865 (HRG survey) | 0 | 8,730 |
| Common dolphin | *Delphinus delphis* | Western North Atlantic | 0 | 9,870 | 0 | 24,030 |
| Pilot whale *spp.* (comprising long-finned and short-finned pilot whale) | *Globicephala melas* and *Globicephala macrorhynchus* | Western North Atlantic | 0 | 417 | 0 | 1,009 |
| Risso's dolphin | *Grampus griseus* | Western North Atlantic | 0 | 200 | 0 | 700 |
| *Family Phocoenidae (porpoises)* | | | | | | |
| Harbor porpoise | *Phocoena phocoena* | Gulf of Maine/Bay of Fundy | 0 | 243 | 0 | 565 |
| *Order Carnivora – Superfamily Pinnipedia* | | | | | | |
| *Family Phocidae (earless seals)* | | | | | | |

187.    Jurisprudence has elucidated that "small numbers" cannot possibly constitute a

66

proportion greater than 10.6% and certainly not as much as 12%.

188. The NFMS is not entitled to deference regarding their small numbers interpretation, in view of the overturning of Chevron. As such, the Court must employ an independent assessment, which objectively, should yield a small numbers interpretation as described herein.

189. When one combines the synergistic impact of Atlantic Shores with the other active MMPA ITAs in the NY/NJ Bight, the MMPA small numbers provision is contravened by an even more substantial margin.

190. The requested annual take for the NARW in the Empire Wind MMPA ITA is 29 NARW.[28] When combined with the Atlantic Shores ITA requested annual takes, 54 NARW are requested to be taken, which is 15.1% of their population. The combined ITAs of Empire and Atlantic Shores request 3,134 (1185 + 1949) northern coastal bottlenose dolphins for the maximum annual take (47.2% of the stock) and 4,542 for the 5-year requested take (68.4% of the stock).

191. Thus, MMPA small numbers is violated both via Atlantic Shores' ITA requested takes, and cumulatively with Atlantic Shores and Empire Wind.

192. The BiOp's Incidental Take Statement ("ITS") entirely fails to consider the impact of past, present, and future marine site characterization surveys on NARWs and marine mammals in the NY/NJ Bight region.

193. The BiOp/ITS assessments grossly underestimate the impact of vessel surveys to the NARW and other marine mammals through reliance on a multiplicative sequence of unsupported, unduly optimistic, noise source level, noise transmission loss and harm criteria.

194. The BiOp/ITS neglect to recognize the ostensible physical evidence of a spatial and temporal correlation between recent whale deaths off the New Jersey shore and the presence of

---

[28] https://www.fisheries.noaa.gov/s3/2024-02/EmpireWind-2024LOA-OPR1.pdf

vessel surveys.

195. The anomalous increase in marine mammal mortality occurred coterminous with the increase in the number of vessel surveys in the NY/NJ Bight.

196. Many other similar whale stranding events have occurred globally.

197. For example, a mass stranding of 12 Cuvier's beaked whales occurred in Cyprus. There were sonar naval exercises conducted in that same region during the days on which strandings occurred. These sonars are analogous to the high intensity sound devices used in the NY/NJ Bight for marine site characterization surveys.

198. The frequencies of the noise devices used coincide with the hearing ranges of maximum sensitivity of the baleen whales and dolphins impacted.

199. The primary impact on the marine mammals, i.e., "disturbance" of their behavior, can lead to serious harm and fatality, is not addressed in the BiOp/ITS, nor is the cumulative impact of multiple vessels operating in the same area

200. No alternative hypothesis can explain the anomalous increase in whale deaths.

201. There is no cogent evidence that the marine site characterization surveys, pile driving, or operational turbine noise will have a "negligible impact" on marine mammals pursuant to the stipulation of the MMPA. In view of the observed marine mammal mortalities derived from the marine site characterization surveys, underestimated impacts from same, underestimated impacts from pile driving, operational noise, and the reality of likely obstruction to the NARWs' migration corridor via operational noise, inter alia.

202. The best scientific evidence available was thus not utilized in the ITS' determination of requested takes, or its conclusion that such takes would have a negligible impact on marine mammals.

203.    Under the MMPA, a taking has a "negligible impact" if it "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103. The NMFS is not entitled to deference on their interpretation of negligible impact, in view of Chevron's eradication, and an independent assessment of the meaning yields a clear violation of this standard here.

204.    Furthermore, the best scientific evidence available was not employed in actually determining the requested takes of marine mammals, as such calculation significantly underestimates the magnitude of takes – both Level B and Level A.

205.    Moreover, beyond underestimates of takes, the NMFS engaged in arbitrary and capricious determinations through their failure to stratify impact to marine mammals as a function of the type of take (Level A or B) and listed status (endangered or not endangered). The scientifically reasonable approach adopted by Wood, Southall and Tollit[29] bifurcate the magnitude marine mammal impact into Level A and B, and endangered / unlisted. This impact categorization is the reasonable, scientifically sound approach as it acknowledges the heightened sensitivity of the endangered species (through use of the potential biological removal level) and degree of impact. See below figure:

---

[29] Wood, J., Southall, B.L. and Tollit, D.J. (2012) PG&E offshore 3-D Seismic Survey Project EIR – Marine Mammal Technical Draft Report. SMRU Ltd.  https://www.coastal.ca.gov/energy/seismic/mm-technical-report-EIR.pdf

Table 3.3 Descriptions of the levels within four intensity components used to rate severity

*Geographical Extent:*

| State-wide | Effects extend outside regional boundary, but within state setting. |
|---|---|
| Regional | Effects likely to extend outside of project boundary to regional setting. |
| Local | Effects likely to be limited within project boundary. |

*Magnitude (Mortality/Injury/Level 'A' take):*

| High | >100% of stock population residual PBR affected |
|---|---|
| Moderate | 50-100% of stock population residual PBR affected |
| Low | 10-50% of stock population residual PBR affected |
| Negligible | <10% of stock population residual PBR affected |

*Magnitude (Disturbance/Level 'B' take):*

| High | >25% of regional non-listed species minimum population / >2.5% ESA-listed regional minimum population |
|---|---|
| Moderate | 15-25% of regional non-listed species minimum population / 1.25-2.5% of ESA-listed regional minimum population |
| Low | 5-15% of regional non-listed species minimum population / 1 ESA-listed animal and <1.25% of ESA listed minimum population |
| Negligible | <5% of regional minimum population / <1 ESA listed animal |

*Duration:*

| Long-term | refers to more permanent effects that may last for more than 3 months (a season) to years and from which the affected animals or resource never revert back to a "normal" condition |
|---|---|
| Moderate-term | refers to a temporary effect that lasts 1 to 3 months and the affected animals or resource may revert back to a "normal" condition. |
| Short-term | refers to a temporary effect that lasts from days to one month and the affected animals or resource revert back to a "normal" condition. |

*Frequency:*

| Continuous | Effects continuous. |
|---|---|
| Intermittent | Effects intermittent, but repeated. |
| Isolated | Effects confined to one or two periods. |

Intensity component levels, once established, were used to determine a severity rating using a matrix approach depicted below in Table 3.4. Severity ratings were described as High, Medium, Low or Negligible.

206.    As such, based upon that well-established scientific research, the NMFS authorized a "high" magnitude (greater than 25% of population) of Level B take for the northern coastal migratory bottlenose dolphin. The NMFS failure to use the Southall approach which appreciates the true magnitude of impact to marine mammals is arbitrary and capricious. Finally, the agency's assertion that one-third of a particular marine mammal population complies with the small numbers provision of the MMPA is arbitrary and capricious.

207.    As explicated supra, the agencies underestimate the injurious effects of marine site characterization surveys, pile driving, and operational noise on marine mammals. They fail to employ the best science available on all of these issues in developing their take estimates. The agencies fail to conduct a cumulative analysis of marine site characterization surveys, pile driving, and operational noise on the takes of marine mammals. As a result, Level B and Level A takes are significantly underestimated and render the agencies determinations arbitrary and capricious.

208.    As such, the determinations of NMFS with its MMPA ITA, violate the MMPA and APA (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)) for the aforesaid reasons. And as such, Plaintiffs SLBI, Dr. Robert Stern, Captain Alan Shinn, and Captain Mike Young, have all been harmed through violation of MMPA and APA.

**Fourth Cause of Action**
**Violation of Coastal Zone Management Act and Administrative Procedures Act**

209.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

210.    The CZMA provides in pertinent part that, "Each Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone

71

shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 USCS § 1456(c)(1)(A), 15 CFR 930.70.

211. The State of New Jersey has adopted, and the federal government has approved, New Jersey's Coastal Zone Management Program, administered through the Coastal Zone Management Rules, set forth at N.J.A.C. 7:7.

212. Whether compliance is achieved with many of the CZMA rules ultimately turns on the degree to which the project's effects are mitigated, within the meaning of the word "discouraged."[30] The proposed use of the coastal resources in question should be deterred (per the meaning of "discouraged"), but because the DEP believes the project furthers "the public interest,"[31] the proposed use is countenanced if sufficient mitigating measures are taken to attain a net gain in the coastal resource impacted. Importantly, in some CZMA rule instances, the word "prohibited" is used, which means the proposed use of coastal resources is unacceptable.

- N.J.A.C. 7.7-15.4(b)(1) – precludes energy facility siting in certain areas unless facilities will not cause adverse impact; DEP acknowledges adverse impacts but provides no sufficient countermanding mitigations to attain a net gain in the coastal

---

[30] Discouraged" means that a proposed use of coastal resources is likely to be rejected or denied as the Department has determined that such uses of coastal resources should be deterred. In cases where the Department considers the proposed use to be in the public interest despite its discouraged status, the Department may permit the use provided that mitigating or compensating measures can be taken so that there is a net gain in quality and quantity of the coastal resource of concern. N.J.A.C. 7:7-1.5.

[31] Note that the DEP's bald allegations of public interest are unsupported by any evidence. This is because there, indeed, is a dearth of evidence justifying public interest, including an absence of climate change benefit. Furthermore, emerging scientific data on wind wake losses are highly suggestive that Atlantic Shores' power generation will be *significantly* lower than they initially estimated, leading to a greater reliance on back-up fossil fuel generation. The final EIS stated no substantive purpose and need for the project, it states only the BOEM administrative purpose, i.e., to approve or disapprove it.

resource impacted. Therefore, this criterion is not met.

- N.J.A.C. 7.7-16.10(c) – provides that new coastal development visually disharmonious with existing scenic resources is discouraged, yet DEP adduces no evidence in support of its public interest argument or means whereby it intends to achieve countervailing mitigations to attain a net gain in the coastal resource impacted (thereby failing to satisfy the "discouraged" test and this criterion).

- N.J.A.C. 7.7-9.38(c) – provides that development adversely affecting public open space is discouraged, and DEP recognizes the discouraged status and adverse impact, but does not produce a compensating mitigation plan sufficient to meet the "net gain of resource" stipulation in the rules. Therefore, this criterion is not met.

- N.J.A.C. 7.7-16.2 – discourages any activity that would adversely affect the natural functioning of marine fish and discourages any activity that would adversely affect any New Jersey based marine fisheries or access thereto; the DEP recognizes adverse impact, yet provides no mitigatory mechanism sufficient to justify the putative public interest or to attain a net gain in the coastal resource impacted. Therefore, this criterion is not met.

- N.J.A.C. 7.7-9.3 - prohibits development which would result in the destruction, condemnation, or contamination of surf clam areas except if the national interest is furthered, assuming there are no prudent and feasible alternatives **and** impacts to surf clam areas are minimized. Neither of those "exceptions" are apposite. No benefit in furtherance of "national interest" is clear (i.e., negligible impact on climate change, and interference with military radars actually jeopardizes national interest). And there are, indeed, feasible alternative sites that can be developed by

73

Atlantic Shores (e.g., farther east into the Atlantic). Nor have impacts to surf clam areas been minimized since BOEM has rejected proposals for reseeding new surf clam areas. Therefore, this criterion is not met.

- N.J.A.C. 7.7-9.4 – provides that prime fishing areas only be utilized for certain uses, and those uses do not include offshore wind activities; DEP acknowledges the adverse impact, but again, provides no means whereby same will be mitigated.

- N.J.A.C. 7.7-9.34(b-e) - discourages development that detracts from, encroaches upon, damages, or destroys the value of historic and archaeological resources, and development in "undeveloped areas near historic and archaeological resources is conditionally acceptable, provided that the design of the proposed development is compatible with the appearance of the historic and archaeological resource." And notwithstanding BOEM's admittance of major impact to cultural resources, including the discovery through vessel surveys of now submerged ancient archeological resources that could shed light on the origin of the first humans to come to North America, and DEP's recognition of same, it posits no mechanism to achieve the required net gain in quality and quantity of the coastal resource. Therefore, this criterion is not met.

- N.J.A.C. 7.7-9.36 – provides, in subsection (b), that "development of endangered or threatened wildlife or plant species habitat is prohibited unless it can be demonstrated that endangered or threatened wildlife or plant species habitat would not directly or through secondary impacts on the relevant site or in the surrounding area be adversely affected." Here the word "prohibited" is employed. The DEP and BOEM acknowledge the presence of multiple endangered species within the

74

project area. But the DEP fallaciously abdicated its duty to provide a species impact assessment pursuant to N.J.A.C. 7:7-11 for the NARW, and further, does not cite sufficient mitigatory protocols for all endangered species' impacts. However, the EIS cites numerous instances of adverse effect on the NARW. According to BOEM, the adverse impact of the proposed Atlantic Shores South plan on the endangered NARW will be major and adverse and "could have severe population level effects (FEIS, 3.5.6.-85). Therefore, this criterion is not met.

- N.J.A.C. 7.7-15.4(a-c) – of particular concern in this rule is the parlance which provides, "Coastal energy facilities construction and operation shall not directly or indirectly result in net loss of employment in the State for any single year; (1) Coastal energy facility construction and operation which results in loss of 200 or more person-years of employment in jobs in New Jersey directly or indirectly related to the State's coastal tourism industry in any single year is prohibited." Here, the word "prohibited" is employed. Based on tourism losses predicted by a BOEM sponsored University of Delaware study applied to shore employment data in a NOAA database, the project will cause a loss of 1300 tourism jobs, well above the 200 person years of employment in the state's coastal tourism industry in a single year, and therefore must be prohibited. In addition, considering job losses in tourism, commercial fishing and from higher electric rates, the project will cause both a net employment loss in the State for a single year, and must be prohibited on that basis as well.

- N.J.A.C. 7.7-16.11 – provides in sub (b) that "Development shall be compatible with adjacent land uses to the maximum extent practicable and development that

is likely to adversely affect adjacent areas, particularly special areas, N.J.A.C. 7:7-9, or residential or recreation uses, is prohibited unless the impact is mitigated by an adequate buffer." There is no adequate buffer. DEP concedes adverse visual impact, but avers that 8.7 miles is the buffer. It neglects to explain how this mitigates the impact. It does not address the buffers for other "special areas" or recreational uses, inter alia. Therefore, this criterion is not met.

213.    Although the NJDEP issued a consistency determination for the Project, that determination is not supported by the record. Because BOEM's approval of the Atlantic Shores Project is discordant with the requirements of NJ CZMA rules, the approval constitutes final agency actions that is arbitrary, capricious, and otherwise not in accordance with the law (including, but not limited to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)). BOEM's approval should thus be nullified and set aside by this Court. And as such, Plaintiffs SLBI, Dr. Robert Stern, Captain Alan Shinn, and Captain Mike Young, have all been harmed through violation of CZMA and APA.

**Fifth Cause of Action**

**[Violations Of The Outer Continental Shelf Lands Act and Administrative Procedures Act]**

214.    Plaintiffs reallege and incorporate by this reference all allegations set forth in the preceding paragraphs of this complaint.

215.    On August 13, 2024, Plaintiffs SLBI and Robert Stern, Ph.D., submitted to defendants and real party a 60-day Notice of Intent to Sue, describing how the proposed Atlantic Shores South OSW project, if implemented, would violate the Outer Continental Shelf Lands Act (OCSLA) [43 U.S.C. §§ 1331, et seq.] by adversely affecting sensitive biological resources

(notably, the federally-listed NARW); disrupting mission critical operations of the Department of Defense; and substantially interfering with ongoing economic activities in the high seas and territorial sees, including but not limited to tourism, commercial fishing and whale watching.

216. On September 12, 2024, Surfside LLC submitted to defendants and real party a 60-day Notice of Intent to Sue, describing how the Atlantic Shores South OSW project, if implemented, would interfere with, disrupt, and devastate the long-established, NMFS-recognized clam fishery on which Surfside relies. As explained in Surfside's 60-day Notice of Intent to Sue, OCLSA prohibits the Secretary from approving a project, such as the Atlantic Shores South OSW facility, which has the potential to substantially interfere with ongoing economic activities, especially those conducted pursuant to established fisheries.

217. Defendants and real party did not take steps to redress the OCSLA violations identified in the two 60-day Notices of Intent to Sue described above. Accordingly, Plaintiffs have been compelled to include in this complaint a cause of action against defendants and real party for failure to comply with OCSLA. See 43 U.S.C. § 1349(a)(2)(A). Moreover, all plaintiffs in this action submitted a Notice of Adoption of the OCSLA notices of intent to sue (both original and supplemental) submitted by Surfside, LLC.

218. Alternatively, Plaintiffs also allege their OCSLA claims via the APA, as BOEM's approval of Atlantic Shores pursuant to OCSLA was arbitrary and capricious, and contrary to law, and unsupported by substantial evidence, due to the reasons set forth below (including but not limited to APA subsections, 5 U.S.C. §706(2)(A), (C), (E)).

219. The Secretary failed to ensure that the Atlantic Shores South project would be implemented in a manner that would ***protect the environment and conserve the natural resource***s of the outer Continental Shelf:

a.   Under OCSLA, the Secretary of the Interior (the "Secretary") "shall

ensure that any activity under this subsection is carried out in a manner that provides for –

"(B) protection of the environment; [and]
"(D) conservation of the natural resources of the outer Continental Shelf. "

b.   In this case, the Atlantic Shores South project – approval of which

constitutes an "activity" under OCSLA – has the potential to degrade the environment and

substantially damage the natural resources of the outer Continental Shelf. Specifically, the

Atlantic Shores South project, like nearly every other offshore wind facility approved or

contemplated on the east coast of the United States, will be constructed and operated within

waters used by the federally-listed NARW for migration, feeding, and other life cycle behaviors.

c.   According to the project's  application for Incidental Take Authorization

for construction and operation, its lease area intersects a critical migration route of the critically

endangered NARW. During construction of the project, real party will engage in underwater pile

driving to embed the wind turbines in the seafloor. This will generate intense noise impacts

deleterious to cetaceans such as the NARW. NARWs  passing within several miles of a pile

driving operation can accumulate enough noise energy to suffer permanent hearing loss without

necessarily being exposed to levels that disturb behavior . Alternatively, whales swimming away

from the project area to avoid the pile driving noise may enter into less-preferred waters, where

they will encounter a host of threats, including beach stranding and collisions with vessels and

entanglement in fishing gear. Even without these threats, the energy necessary to evade the

project's construction noise will drain the whales, whose physical condition is already

compromised by loss of foraging opportunities. In fact, recent studies show that NARWs,

especially reproductive-age females, have sharply diminished physical fitness as compared to

other whales. This has resulted in fewer calves per female and longer intervals between calf

78

births. This trend, which the project will help to perpetuate, will cause the NARW population, which currently rests at approximately 330 individuals, to continue its downward trajectory, leading ultimately to extinction.

d.   Other construction impacts include increased risk of vessel strikes from project-related ships and personnel transfer boats transiting to, from, and through the project area, many of which will be allowed to travel in excess of 10 knots per hour. As admitted by the National Marine Fisheries Service (NMFS) in the Biological Opinion (BiOp) for the Atlantic Shores South project (and others), a vessel collision at speeds greater than 10 knots per hour will usually result in serious injury to the whale, while a collision at speeds greater than 15 knots per hour will kill the whale almost 100 percent of the time.

e.   The project's adverse effects on NARW do not end with the completion of construction. In fact, the project's *operational* impacts will likely pose the greatest threat to NARW, as those impacts will be felt for the entire 30-year life of the Atlantic Shores South facility. These operational impacts include turbine noise, which BOEM, NMFS, and the applicant continue to either miscalculate or misrepresent in their various environmental review documents. When one applies the proper operational sound source levels representative of the large turbines proposed here – not the incredibly optimistic and unsupported sound source levels for small turbines assumed by the federal government and the applicant – it is clear that the project's operational noise will generate harassment contours of much greater size than those reported in the BiOp and the Letter of Authorization issued by NMFS under the Marine Mammal Protection Act (MMPA). As a result, NARW will be forced to swim a considerable distance away from the project site to avoid the noise created by the project, day-in, day-out, to try to find a noise free migration path, requiring the whales to expend a great deal of energy and move into

79

waters where the threat of vessel collision and fishing gear entanglement is ever-present. Exacerbating the vessel collision risk, the U.S. Coast Guard is planning a commercial vessel shipping "safety fairway" adjacent to the eastern edge of the Atlantic Shores project. The reference to "safety" is misleading, because the fairway is intended to safeguard vessel traffic flow, not whales. Vessels will be encouraged to use this "fairway" as a means of bypassing the infrastructure and related impacts associated with the Atlantic Shores South OSW project – impacts like onboard radar interference that can slow or endanger vessel transit. Thus, vessel traffic in the proposed fairway will increase, enlarging and intensifying the threat to any NARW which, in an avoidance response to the proposed OSW project, swims into the fairway. Considering other planned projects in the New York Bight area, the cumulative effect of the operational noise from all the projects may very well block the essential NARW migration.

f.    Recent experiences at the recently-installed Vineyard Wind offshore wind facility in Massachusetts has revealed yet another operational impact on the marine environment that could adversely affect NARW and other marine resources: collapse and disintegration of turbine blades, the composition of which includes potentially toxic materials. If such materials were ingested by marine animals, the biological damage could be severe and long-term.

g.    To compound matters, the Atlantic Shores South offshore wind facility is only one of approximately 30 such projects approved or planned for implementation along the eastern seaboard of the United States. Nearly all of these projects are located in NARW habitat, including its critical migration route. This means that the same cohort of NARW individuals that must navigate the offshore wind arrays in Maine, Massachusetts, and Rhode Island must also navigate the wind arrays off the coast of New York, New Jersey, Delaware, Maryland, Virginia, and North Carolina. The cumulative impacts of this situation on NARW have not been studied

80

by BOEM or NMFS (or anyone else), despite the requirement to do so under the NEPA), the ESA, the MMPA, and OCSLA. However,  because NARW population declines and compromised physical fitness have been well-documented, it is reasonable to assume that the adverse effects of the Atlantic Shores project, when combined with those of the other eastern seaboard offshore wind projects, will be cumulatively significant, perhaps devastating.

220.    By approving the Atlantic Shores Project, the Secretary failed to protect the national *security* interests of the United States:

a.    In addition to protecting the natural resources of the outer Continental Shelf, OCSLA also safeguards the integrity of military operations and infrastructure along America's extensive coastline. Specifically, under 43 U.S.C. § 1337(p)(4)(F), the Secretary must ensure that any federal activity to be carried out under the aegis of OCSLA provide for the "protection of the National Security of the United States."

b.    The data indicate that the Atlantic Shores South project, like many of the offshore wind facilities approved or planned for the Atlantic Coast, has the potential to substantially disrupt naval sea and air operations by interfering with radar, sonar, and other communications, and by exposing navy ships and low-flying military planes to obstructions (i.e., the wind turbines themselves). In fact, it is SLBI's understanding that the Department of Defense has notified BOEM of this potentially significant impact of the government's offshore wind program as a whole.

c.    Given its location, the proposed project will place numerous, very tall, closely spaced wind turbines between the military radars at Gibbsboro, NJ, that are part of our NORAD early warning system, and their line of sight to the open ocean, impairing their ability to detect national security threats. The project applicant, real party Atlantic Shores Offshore Wind,

LLC, must demonstrate through its Construction and Operations Plan (COP) that the project will not unreasonably interfere with other uses of the outer Continental Shelf, including those involved with National Security or defense. 30 C.F.R. § 585.621(c). Real party made no such demonstration was made.

d.    A defense consultant, Westslope Incorporated, hired by real party, stated in its report that the Department of Defense "should be concerned" about the project's potential interference with the military radar installations in Gibbsboro, New Jersey. Our review of the Atlantic Shores South documentation, including its COP, uncovered no measures to adequately mitigate this and other impacts and thus ensure the integrity of the military and homeland security operations that currently take place in or near the Atlantic Shores South project. Consequently, the Secretary, by approving the project, failed to ensure the protection of the National Security of the United States, resulting in a violation of OCSLA. 43 U.S.C. § 1337(p)(4)(F); see also 30 C.F.R. § 585.621(c).

e.    In addition, BOEM was advised by DOD by letter of December 15, 2020, that the Atlantic Shores project "will adversely affect NORAD's missions by hampering or degrading air surveillance radar performance". That letter included a map showing the inner half of the Atlantic Shores lease area as an "exclusion zone" for defense purposes, but that inner half of the lease area has been retained for turbine presence without any explanation from the BOEM or the DOD.

221.    By approving the Atlantic Shores project, the Secretary failed to prevent interference with reasonable *economic uses* of the ocean:

82

a.   OCSLA requires the Secretary, when considering proposed activities in the outer Continental Shelf, ensure the "prevention of interference with reasonable uses . . . of the exclusive economic zone, the high seas, and the territorial seas." 43 U.S.C. § 1337(p)(4)(I); 30 C.F.R. § 585.621(c); see also 43 U.S.C. § 1337(p)(4)(J). In the case of the Atlantic Shores South project, the Secretary failed to meet this obligation.

b.   The Atlantic outer Continental Shelf of the United States supports some of the most productive fisheries in the world. They are the economic life-blood of hundreds of communities up and down the eastern seaboard, including small fishing towns along the coast of New Jersey. In terms of economic importance, the fishing industry off America's Atlantic Coast generates more than $100 billion each year. That industry, already under threat from various pressures, is now faced with the prospect of having its vessels pushed out of hundreds of square miles of high-value fishing waters by BOEM's offshore wind program.

c.   Like many of the other offshore wind facilities approved or planned for the eastern seaboard, the Atlantic Shores South project will be installed in areas currently used by recreational and commercial fishing vessels. These vessels, however, will no longer be able to fish safely in these waters, for fear of tangling and losing fishing gear on the underwater portions of the wind turbines and transmission cables.

d.   Even fishing vessels that simply plan to transit through the project area will be affected, as they will be forced to go around the wind array before recommencing their journey on their original route, resulting in the loss of time and fuel.

e.   The Atlantic Shore South EIS and COP include no mitigation measure that adequately addresses the project's impacts on fishing activity in the affected area. To the extent

83

financial compensation has been proposed or adopted, we are informed by the relevant fishing interests that it is inadequate.

f.    Tourism will also be unreasonably affected, as the project will adversely impact whale watching off the New Jersey coast. In addition, this project would place two-hundred, 1,047 foot tall turbines, starting just 8.7 miles from a barrier island community dependent on tourism, making it the most visible modern wind project in the world. Because the project's wind turbines will be clearly visible from the beaches along Long Beach Island and other nearby communities, it will substantially degrade the currently-unobstructed viewshed toward the ocean, effectively destroying one of the key aesthetic features that draw tourists to this part of New Jersey. Given that the coastal viewshed is an important natural resource of the outer Continental Shelf, the Secretary is required to protect it from damage. See U.S.C. § 1337(p)(4)(B) and (D). By approving the Atlantic Shores South project, the Secretary failed to discharge this duty. Two studies have placed the loss in tourism revenue over the project lifetime at $12 billion to Ocean County, NJ and $22 billion to Atlantic County, NJ.

g.    Therefore, by approving the Atlantic Shores South project, the Secretary failed to prevent substantial interference of reasonable uses of the "exclusive economic zone, the high seas, and the territorial seas," resulting in a violation of OCSLA. U.S.C. § 1337(p)(4)(I).

222.    The Secretary has an affirmative duty to require that all offshore wind applicants prevent discharges of any materials that could degrade the marine environment. For example, under 30 CFR section 585.105(a), the Secretary must instruct project applicants as follows:

> Design your projects and conduct all activities in a manner that
> ensures safety and will not cause undue harm or damage to
> natural resources, including their physical, atmospheric, and

biological components to the extent practicable; and take measures to prevent unauthorized discharge of pollutants including marine trash and debris into the offshore environment;

There is no evidence the Secretary has made such admonishments to the Atlantic Shores South applicant and/or taken the steps necessary to ensure the proper protective measures will be implemented.

    (a)    The Atlantic Shores South project, like all offshore wind facilities planned and/or approved by BOAM, will be decommissioned at the end of its planned useful life, assuming it remains in operation that long. None of BOEM's environmental or planning documents, however, analyzes the specific mechanics and impacts of removing and onshore processing of an industrial-scale wind array to the extent required to restore clam harvesting or how such removal will affect marine life and ongoing economic uses.

    (b)    OCSLA also imposes a duty on the Secretary to ensure that activities on the OCS are conducted in a manner that minimizes environmental damage and prevents undue interference with other lawful uses, such as commercial fishing. In the context of decommissioning, the Secretary is required to ensure that the project is decommissioned in a way that minimizes harm and restores the seafloor to conditions that allow for the continuation of reasonable uses, such as clam fishing.

(c)  There is no evidence that such considerations were made in the case of the Atlantic Shores South project. The Secretary failed to impose the necessary conditions to avoid or minimize the long-term impact of the project on the seafloor and the clam fishery during decommissioning, as required by U.S.C. § 1337(p)(6)(C). This is another example of the failure to comply with the protective mandates of OCSLA and the environmental review process mandated under NEPA.

(d)  OCSLA imposes certain obligations on the project applicant upon decommissioning. Among these is the duty to restore oceanic and sea floor conditions to their prior state, thereby allowing disrupted natural and economic activities to return. See U.S.C. § 1337(p)(6)(C). There is no evidence that BOEM or any other federal or state agency has required real party to meet this obligation, or to provide the surety bond financial assurance required by the OCSLA for such facility removals. This, too, constitutes a failure by the Secretary to comply with the protective mandates of OCSLA and NEPA.

223.  As the foregoing makes clear, the Secretary was without legal authority to approve the Atlantic Shores South project. To the contrary, the data demonstrate that the project, as adopted, will not provide for the protection of the environment; the conservation of the natural resources of the outer Continental Shelf; the protection of the National Security interests of the United States; and/or the prevention of interference with reasonable uses of the exclusive economic zone, the high seas, or the territorial seas. (including but not limited to, U.S.C. § 1337(p)(4)(B), (D), (F), (I), and (J)). Accordingly, the Secretary has violated OCSLA. To correct this error, all project approvals issued by the Secretary or agencies subaltern to the Department of Interior must be rescinded prior to construction of the Atlantic Shores South facility.

224.  Additionally, by the very location of this lease area, its radical proximity to the

shore, its intersection with a critical NARW migratory route, and its blocking of defense radars and the use of prime fishing areas, even a modified wind turbine project in this lease area cannot meet the OCSLA requirements outlined above. Therefore, this lease area should be cancelled consistent with the OCSLA renewable energy statutory and regulatory criteria.

225.    Recently, the acting Solicitor withdrew[32] Solicitor's Opinion M-37067 and reinstated M-Opinion 37059, which ensures that the Secretary err on the side of ensuring less interference with reasonable uses.[33] These reasonable uses include that which Plaintiff Captain Shinn engages in, including but not limited to commercial fishing, sportfishing, recreational activities, boating/shipping, etc. As such, Plaintiff Shinn has been harmed.

226.    As explained by the Acting Solicitor, "The Anderson Opinion's assertion that 'subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals" both diminishes the importance of each subparagraph (contrast "mandatory" with "goals"), while also opening the door to the possibility that any one criterion may be favored over another. This no longer reflects the best, or even a permissible, agency interpretation. It must therefore be withdrawn.'" However, the Atlantic Shores Project was sanctioned under the erroneous interpretation of subsection 8(p)(4), a construction that simply cannot be reconciled with the best, proper interpretation of that provision, namely one that gives meaning and value to each individual criterion.[34] Thus, Atlantic Shores' approvals should be forthwith rescinded and reexamined under

---

[32] https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf

[33] "(4) Requirements. The Secretary [of the Interior] shall ensure that any activity under this subsection is carried out in a manner that provides for— . . . (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas[.]" § 1337(p)(4).

[34] See Atlantic Shores' Record of Decision, where BOEM states, "The Secretary's authorization must comply with OCSLA subsection 8(p)(4) (43 USC § 1337(p)(4)), which 'imposes a general duty on the Secretary to act in a manner providing for the subsection's [various policy] goals.' According to M-Opinion 37067, "[t]he subsection does not require the Secretary to ensure that

the proper subsection 8(p)(4) framework. BOEM's disregard of the requirements of OCSLA for offshore wind approval is arbitrary, capricious, and otherwise not in accordance with law.

227.    BOEM has violated OCSLA by abdicating its duty to ensure the prevention of pollution, discharges, or otherwise, which can degrade the marine environment.

228.    Pursuant to OCSLA regulations, at 30 CFR 585.105, it provides: "(a) Design your projects and conduct all activities in a manner that ensures safety and will not cause undue harm or damage to natural resources, including their physical, atmospheric, and biological components to the extent practicable; and take measures to prevent unauthorized discharge of pollutants including marine trash and debris

into the offshore environment."

229.    There is no evidence in the BiOp, EIS documents, ITA, or elsewhere that the Secretary has directed the applicant or otherwise taken such steps necessary to obviate the above from eventuating, for example, the recent blade failure event(s) attendant Vineyard Wind 1, and the multiplicity of examples globally of recurring blade failure events. In fact, there does not appear to be a blade failure event plan even contained in the Construction and Operations Plan.

230.    And as such, Plaintiffs SLBI, Dr. Robert Stern, Plaintiff Captain Alan Shinn, Plaintiff Captain Mike Young, Plaintiff Kline Brothers Landscaping, Plaintiff Coastal Living Real Estate Group, Plaintiff Sea Shell Resort, and Plaintiff Vacation Rentals Jersey Shore, LLC have all been harmed through the aforesaid violations of OCSLA and APA (including, but not limited

---

the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension." **But this Opinion, M-37067, was abrogated, rendering its operational force null and void. Thus, Atlantic Shores' approval was predicated upon an erroneous interpretation of OCSLA.** https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Atlantic%20Shores%20South%20ROD.pdf

to, APA subsections, 5 U.S.C. §706(2)(A), (C), (E)).

**Prayer for Relief**

231.     Adjudge and declare that Defendant BOEM's award of the lease areas now designated as OCS-A-0499 and 0570, and approval of the ROD for the Atlantic Shores South Project, including its Final EIS, violates NEPA and its implementing regulations;

232.     Adjudge and declare that Defendant NMFS' December 18, 2023 BiOp, including the Incidental Take Statement, for the Atlantic Shores South project (GARFO-2023-01804) was arbitrary, capricious, and unlawful;

233.     Adjudge and declare that Defendant NMFS' December 18, 2023 BiOp for the Atlantic Shores South project (GARFO-2023-01804) violates Section 7(a)(2) of the ESA because it concludes, with insufficient evidence, that BOEM's action (i.e., approval of the Atlantic Shores Project) will not jeopardize the North Atlantic Right Whale or any other federally-listed species;

234.     Adjudge and declare that Defendant BOEM's approval of the Atlantic Shores Project violates Section 7(a)(2) of the ESA because BOEM has failed to ensure that its actions do not jeopardize the North Atlantic Right Whale and all other federally-listed species potentially affected by the Project;

235.     Adjudge and declare that this project is inherently incompatible with the requirements of the Endangered Species Act because its placement in a primary migration path of the critically endangered NARW and its unmitigable operation will significantly obstruct that migration, jeopardizing its continuing existence.

236.     Adjudge and declare that the placement of any offshore wind project in this flawed project area (of Atlantic Shores) is incompatible with the requirements of the Endangered Species Act because of its location in a primary migration corridor of the critically endangered NARW and

89

its unmitigable operation will significantly obstruct that migration, jeopardizing its continued existence; and that the project's placement is incompatible with the OCLSA preservation of defense and other requirements; and, accordingly, issue an order requiring BOEM to initiate lease cancellation of this project area.

237.    An order holding unlawful, vacating, and setting aside Defendants' July 2, 2024, decision approving the Record of Decision, Construction and Operations Plan for Atlantic Shores South project, and the MMPA ITA,  as arbitrary, capricious, and otherwise not in accordance with the law;

238.    An order directing BOEM to establish contract(s) with Atlantic Shores Offshore Wind, LLC for beach and ocean pollution remediation due to broken parts, for turbine removal and onshore processing at termination of operation, and for remediation of marine debris, and any other waste discharged into the waters as a result of activities, accidents, or other environmental degradation events associated with the project.

239.    Reasonable attorneys' fees and costs for bringing this suit;

240.    Such other and further relief as the Court deems appropriate.

Dated: July 11, 2025

Respectfully submitted,

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
*Counsel for Plaintiffs*
DC Bar ID number: 90015331
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244