**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SAVE LONG BEACH ISLAND, *et al*. <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF COMMERCE, *et al*. <br><br> *Defendants*. | Case No.: 1:25-cv-02211-JMC <br> Judge Jia M. Cobb |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PROPOSED
INTERVENOR DEFENDANT'S MOTION TO INTERVENE**</u>

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................2

    A.  The Project...................................................................................................2

    B.  Multi-Year Federal Review and Approval Process ....................................3

    C.  Financial Obligations and Commercial Commitments................................7

    D.  Plaintiffs' Complaint...................................................................................7

III.  ARGUMENT.........................................................................................................8

    A.  The Motion is Timely. .................................................................................8

    B.  Atlantic Shores Has an Interest Related to the Subject Matter of this Action..........................................................................................................9

    C.  Disposition of this Case May Impair or Impede Atlantic Shores' Interests.....................................................................................................12

    D.  The Federal Defendants Do Not Adequately Represent Atlantic Shores' Interests.......................................................................................14

    E.  Alternatively, Atlantic Shores Seeks Permissive Intervention. ...............18

IV.  CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chester Water Auth. v. Susquehanna River Basin Comm'n*,
No. 14-CV-1076, 2014 WL 3908186 (M.D. Pa. Aug. 11, 2014) ...........................................11

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
640 F. Supp. 3d 59 (D.D.C. 2022) ....................................................................................9, 10

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
340 F.R.D. 1 (D.D.C. 2021) .................................................................................................18

*Dimond v. Dist. of Columbia*,
792 F.2d 179 (D.C. Cir. 1986) .............................................................................................14

*In re Endangered Species Act Section 4 Deadline Litigation*,
270 F.R.D. 1 (D.D.C. 2010) .................................................................................................18

*Equal Emp. Opportunity Comm'n v. Nat'l Children's Ctr.*,
146 F.3d 1042 (D.C. Cir. 1998) ...........................................................................................18

*\*Farmer v. EPA*,
759 F. Supp. 3d 101 (D.D.C. 2024) ...................................................................................9, 14

*Friends of Animals v. Ashe*,
No. CV 15-0653, 2015 WL 13672461 (D.D.C. June 12, 2015) ............................................13

*Friends of Earth v. Haaland*,
No. CV 21-2317, 2022 WL 136763 (D.D.C. Jan. 15, 2022) .................................................10

*Friends of the Headwaters v. U.S. Army Corps of Eng'rs*,
No. CV 21-0189, 2021 WL 1061162 (D.D.C. Mar. 20, 2021)...............................................13

*Jones v. Prince George's Cnty., Md.*,
348 F.3d 1014 (D.C. Cir. 2003) .............................................................................................8

*\*Karsner v. Lothian*,
532 F.3d 876 (D.C. Cir. 2008) .....................................................................................8, 9, 12

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998)...........................................................................................10, 16

*Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*,
348 F.R.D. 397 (D.D.C. 2025)................................................................................................8

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................................................10

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*,
    66 F.4th 282 (D.C. Cir. 2023)...................................................................................17

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998).................................................................................12

*\*Nat. Res. Def. Council v. Costle*,
    561 F.2d 904 (D.C. Cir. 1977)...................................................................12, 15, 17

*Nat'l Parks Conservation Ass'n v. EPA*,
    759 F.3d 969 (8th Cir. 2014) ....................................................................................14

*Nuesse v. Camp*,
    385 F.2d 694 (D.C. Cir. 1967)..................................................................................19

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
    338 F.R.D. 1 (D.D.C. 2021).......................................................................................15

*S.C. Coastal Conservation League v. Ross*,
    No. 18-cv-03326, 2019 WL 5872423 (D.S.C. Feb. 8, 2019)...................................11

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
    331 F.R.D. 5 (D.D.C. 2019)................................................................................18, 19

*Save Long Beach Island v. U.S. Dep't of Commerce*,
    No. 3:23-cv-01886-RK-JBD, Dkt. 19 (D.N.J. May 19, 2023) ...................................2

*Save Long Beach Island v. U.S. Dep't of Commerce*,
    No. 3:25-cv-00240-RK-TJB, Dkt. 17 (D.N.J. Mar. 10, 2025) ...................................2

*SEC v. Prudential Sec. Inc.*,
    136 F.3d 153 (D.C. Cir. 1998).....................................................................................8

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)...................................................................................................14

*United States v. British Am. Tobacco Austl. Servs., Ltd.*,
    437 F.3d 1235 (D.C. Cir. 2006)...................................................................................9

*W. Energy All. v. Zinke*,
    877 F.3d 1157 (10th Cir. 2017) ................................................................................15

*WildEarth Guardians v. Salazar*,
    272 F.R.D. 4 (D.D.C. 2010)................................................................................10, 15

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*WildEarth Guardians v. U.S. Forest Serv.*,
 573 F.3d 992 (10th Cir. 2009) ............................................................................11

**Statutes**

15 C.F.R. Part 930 Subparts D and E .....................................................................6

16 U.S.C. § 1371...............................................................................................6, 13

16 U.S.C. § 1451..................................................................................................... 6

16 U.S.C. § 1456(c)(3)(A) ......................................................................................6

30 C.F.R. § 585.627(b) ...........................................................................................7

30 C.F.R. § 585.600.............................................................................................4, 13

30 C.F.R. § 585.620(c)...........................................................................................13

30 C.F.R. § 585.628(f) ........................................................................................5, 13

5 U.S.C. §§ 551, *et seq.*.........................................................................................1

16 U.S.C. § 1536.....................................................................................................5

Fed. R. Civ. P. 24(a)(2)................................................................8, 9, 10, 12, 18, 20

Fed. R. Civ. P. 24(b)(1), (B) .............................................................................18, 19

42 U.S.C. §§ 4370m *et seq*. ..................................................................................4

42 U.S.C. §§ 4321, *et seq.*......................................................................................4

Rule 24, *et seq.*..........................................................................2, 8, 10, 18, 19

**Other Authorities**

Memorandum from Gregory Wischer, Deputy Chief of Staff – Policy, to Acting
 Assistant Secretary for Fish and Wildlife and Parks, Ensuring Compliance
 with the Bald and Golden Eagle Protection Act and Executive Order 14315
 (Aug. 4, 2025), Doug Burgum (@SecretaryBurgum), X (Aug. 4, 2025, at 6:48
 PM ET), https://x.com/SecretaryBurgum/status/1952501870393786822..............16

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

NMFS, Endangered Species Act Section 7 Consultation Biological Opinion for
    Construction, Operation, Maintenance, and Decommissioning of the Atlantic
    Shores South Offshore Energy Project (Lease OCS-A 0499) (Dec. 18, 2023),
    https://repository.library.noaa.gov/view/noaa/66052/noaa_66052_DS1.pdf?do
    wnload-document-submit=Download ........................................................................5

U.S. Dep't of the Interior, Order No. 3437, Ending Preferential Treatment for
    Unreliable, Foreign-Controlled Energy Sources in Department Decision
    Making  § 5 (July 29, 2025),
    https://www.doi.gov/document-library/secretary-order/so-3437-ending-
    preferential-treatment-unreliable-foreign ...............................................................16

Letter from David Diamond, Deputy Chief for Operations, Office of Renewable
    Energy Programs, to Atlantic Shores (Sept. 30, 2024),
    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-
    activities/Segregation%20and%20Designations.pdf ..................................................3

U.S. Dep't of the Interior, Order No. 3438, Managing Federal Energy Resources
    and Protecting the Environment (Aug. 1, 2025),
    https://www.doi.gov/document-library/secretary-order/so-3438-managing-
    federal-energy-resources-and-protecting ..................................................................16

Memorandum from Gregory Wischer, Deputy Chief of Staff – Policy, to the
    Assistant Secretaries, Bureau and Office Heads (July 15, 2025)
    https://www.doi.gov/media/document/departmental-review-procedures-
    decisions-actions-consultations-and-other..............................................................16

Record of Decision, *Atlantic Shores Offshore Wind South Project Construction
    and Operations Plan*
    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-
    activities/Atlantic%20Shores%20South%20ROD.pdf ...............................................3

*Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore
    Wind Leasing and Review of the Federal Government's Leasing and
    Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) .................3, 7, 16

## I.    INTRODUCTION

Atlantic Shores Offshore Wind, LLC (together with certain subsidiary entities, "Atlantic Shores"), seeks to intervene as a defendant in this action to protect its interests in thousands of acres of leases it acquired to build wind energy projects off the coast of New Jersey. Plaintiffs' claims challenge the validity of the federal government authorizations Atlantic Shores has obtained to pursue these critical renewable energy projects. The authorizations, issued by Defendants the United States Department of Commerce, the National Marine Fisheries Service ("NMFS"), the Department of the Interior, and the Bureau of Ocean Energy Management ("BOEM") (collectively, "Federal Defendants"), enable Atlantic Shores to conduct construction activities in compliance with multiple environmental statutes. Yet, according to Plaintiffs, these authorizations should be "vacat[ed]" and "set[] aside" on the theory that they violate the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* ("APA"), Marine Mammal Protection Act ("MMPA"), Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), Outer Continental Shelf Lands Act ("OCSLA"), and the Coastal Zone Management Act ("CZMA"). Complaint ("Compl."), Dkt. No. 1 at 1, 89–90.

Atlantic Shores is entitled to intervene as a matter of right. It timely moved to intervene, doing so before the Federal Defendants responded to Plaintiffs' Complaint. Plaintiffs' Complaint directly implicates Atlantic Shores' protected interests in its projects, offshore wind leases, and in the authorizations it needs to develop these projects. Plaintiffs' claims, if successful, would impair Atlantic Shores' interests by blocking the authorizations pursued and received in good faith, and by unduly delaying or halting development of Atlantic Shores wind energy projects. In addition, Atlantic Shores has unique interests in defending its authorizations which are specific to its individual leases and its related contractual and financial commitments, which differ from those of the Federal Defendants. Alternatively, Atlantic Shores should be granted permissive

1

intervention under Rule 24(b) because its motion is timely, Atlantic Shores' defenses are aligned with the defenses available to the Federal Defendants, and intervention will not prejudice the Plaintiffs' or Federal Defendants' rights or cause undue delay. Plaintiffs advised that they do not oppose this motion to intervene, and counsel for the Federal Defendants advise that they take no position on the motion.

This case is the latest in a series of litigation by Plaintiffs Save Long Beach Island and its President Robert Stern—along with other organizations and individuals opposed to offshore wind—(collectively, "Plaintiffs") challenging Atlantic Shores projects and associated federal approvals. Atlantic Shores has been granted intervention in the other two federal district court cases challenging its projects. *Save Long Beach Island v. U.S. Dep't of Commerce*, No. 3:23-cv-01886-RK-JBD, Dkt. 19 (D.N.J. May 19, 2023); *Save Long Beach Island v. U.S. Dep't of Commerce*, No. 3:25-cv-00240-RK-TJB, Dkt. 17 (D.N.J. Mar. 10, 2025). This Court should likewise grant Atlantic Shores' request to intervene in this case.

## II.    BACKGROUND

### A.    The Project

Atlantic Shores[1] was formed in 2018, with the sole purpose of developing offshore wind energy projects off the Atlantic Coast. Declaration of Joris Veldhoven ("Veldhoven Decl.") ¶ 3.

---

[1] Atlantic Shores Offshore Wind, LLC, is a Delaware limited liability company that serves as a 50:50 joint venture partnership between Shell New Energies US LLC and EDF-RE Offshore Development, LLC. Atlantic Shores Offshore Wind, LLC, is the sole member and is a member manager of, and provides operational services to, the following subsidiaries among others: (1) Atlantic Shores Offshore Wind Project 1, LLC, a Delaware limited liability company, which is the developer of Atlantic Shores South Project - Project 1 under Lease OCS-A 0499; and (2) Atlantic Shores Offshore Wind Project 2, LLC, a Delaware limited liability company, which is the developer of Atlantic Shores South Project - Project 2 under Lease OCS-A-0499 but now under OCS-A 0570. For ease of reference, this brief uses the term "Atlantic Shores" to refer collectively to Atlantic Shores Offshore Wind, LLC and the above-referenced subsidiaries, although each individual subsidiary has primary responsibility for its particular development project. Veldhoven Decl. ¶ 4.

In August 2019, a commercial wind energy lease consisting of over 180,000 acres on the Outer Continental Shelf ("OCS") off the coast of New Jersey ("Lease OCS-A 0499") was assigned to Atlantic Shores. BOEM, Record of Decision for the Atlantic Shores Offshore Wind South Project Construction and Operations Plan at 2–3 (Jul. 1, 2024) ("ROD").[2] Lease OCS-A 0499 was later segregated in 2022, and then again in 2024.[3] Within its lease areas, Atlantic Shores is developing two offshore wind energy projects ("Project 1" and "Project 2"), which will include up to 200 wind turbine generators combined. ROD at 7-8. Project 1 and Project 2 (collectively, the "Project") are anticipated to have a generation capacity of 2.5 gigawatts ("GW"). Veldhoven Decl. ¶ 8.

The Project is intended to help New Jersey reach its current goal of 11 GW of offshore wind energy generation by 2040. *Id*. ¶¶ 10-11, 34. Once completed, the Project is expected to produce enough energy to power approximately one million homes and businesses in New Jersey. *Id*. ¶ 10. In 2021, when the New Jersey Board of Public Utilities ("NJ BPU") awarded Atlantic Shores offshore renewable energy credits ("OREC") for the Project, NJ BPU estimated the Project would bring over $1.8 billion dollars into New Jersey's economy during its development, construction, and operation, *id*. ¶ 11, and create up to 18,550 direct and 40,744 total job-years. *Id*.[4]

      **B.      Multi-Year Federal Review and Approval Process**

---

[2] The ROD is available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Atlantic%20Shores%20South%20ROD.pdf (on file with author).

[3] In 2022, OCS-A 0449 was segregated into two leases, with the northern portion of the original Lease OCS-A 0499 given a new lease number OCS-A 0549. ROD at 3. Lease Area OCS-A 0549 is subject to a separate ongoing federal review and is not included in this suit. In 2024, Lease OCS-A 0499 was further segregated, with the western portion given a new lease number, OCS-A 0570. *See* Letter from David Diamond, Deputy Chief for Operations, Office of Renewable Energy Programs, to Atlantic Shores (Sept. 30, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Segregation%20and%20Designations.pdf (on file with author).

[4] On June 4, 2025, Atlantic Shores filed a petition with NJ BPU to cancel its OREC award due to uncertainties that have arisen from the Presidential Wind Memorandum and related adverse effects. *See infra* Section III.D.; *see also* Veldhoven Decl.¶ 11, n.5.

In the seven years since acquiring Lease OCS-A 0499, Atlantic Shores has invested significant resources into the extensive, multi-year planning and development process for the Project, including by developing voluminous, thorough, technical and scientific submissions to federal, state, and local agencies and participating in numerous public review processes. Veldhoven Decl. ¶¶ 6, 12–21. The federal permitting process that is the subject of this lawsuit has been particularly lengthy and thorough. The Project is also a "covered project" under Title 41 of the Fixing America's Surface Transportation Act ("FAST-41"), 42 U.S.C. § 4370m *et seq.*, under which Congress required federal agencies to manage the permitting timelines of major projects through the issuance of a "coordinated project plan" and a public-facing "dashboard" that shows the status of each of the Project's federal permits and consultations. *Id*. § 4370m-2(b), (c)(1).

### 1.    OCSLA and NEPA

In April 2021, as required by 30 C.F.R. § 585.600(a), Atlantic Shores developed and submitted a Site Assessment Plan ("SAP") prior to conducting site assessment activities in its lease areas. Veldhoven Decl. ¶ 14. BOEM approved the SAP on April 8, 2021. *Id*. Subsequently, Atlantic Shores conducted extensive surveys of its lease areas to understand and characterize the Project site and inform the development of its Construction and Operations Plan ("COP"). *Id.* Atlantic Shores prepared and submitted its initial COP in March 2021 describing the planned facilities and construction and operation activities for the Project; after three years of additional intensive analysis and preparatory permitting activity, the COP was updated and resubmitted in May 2024. *Id*. ¶ 15. The final version of the COP is thousands of pages long with detailed appendices. *Id*.

BOEM commenced its review process under NEPA, 42 U.S.C. §§ 4321, *et seq.*, to assess the potential environmental, social, economic and cultural impacts of the Project by publishing a

4

Notice of Intent ("NOI") to Prepare an Environmental Impact Statement ("EIS") on September 30, 2021. Veldhoven Decl. ¶ 16. Following issuance of the NOI, BOEM solicited public comments and held public scoping meetings for interested parties to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS. *Id*.

Incorporating feedback, BOEM published the draft EIS and initiated a public comment period in May 2023. *Id*. ¶ 17. BOEM held two in-person and two virtual meetings where it again invited public comment and offered an opportunity to provide additional input for BOEM to consider in its NEPA analysis. *Id*. Atlantic Shores attended all of the meetings and submitted written comments. BOEM published its final EIS in May 2024. *Id.* On July 2, 2024, BOEM issued a ROD documenting its adoption of the final EIS pursuant to NEPA, its decision to approve the COP, and its findings as to other applicable statutory requirements. *Id.* ¶ 18. Pursuant to 30 C.F.R. § 585.628(f), BOEM formally approved the COP on October 1, 2024, permitting Atlantic Shores to proceed with development and operation of the Project. *Id*. BOEM's COP approval requires Atlantic Shores to follow over eighty pages of detailed terms and conditions.

### 2. ESA and MMPA

NMFS, along with BOEM and other cooperating agencies, conducted a comprehensive consultation pursuant to Section 7 of the ESA, 16 U.S.C. § 1536, resulting in a December 2023 Biological Opinion ("BiOp") that assessed the potential effects of construction, operation, maintenance and decommissioning of the Project on ESA-listed species and identified enforceable mitigation measures and requirements to minimize impacts to such species. Veldhoven Decl. ¶ 20.[5]

---

[5] NMFS, Endangered Species Act Section 7 Consultation Biological Opinion for Construction, Operation, Maintenance, and Decommissioning of the Atlantic Shores South Offshore Energy Project (Lease OCS-A 0499) (Dec. 18, 2023), available at https://repository.library.noaa.gov/view/noaa/66052/noaa_66052_DS1.pdf?download-document-submit=Download (on file with author).

In September 2022, Atlantic Shores submitted an application to NMFS requesting a Letter of Authorization ("LOA") for the unintentional and non-lethal take of marine mammals incidental to construction of the Project. *Id.* ¶ 19. After conducting a formal rulemaking process, on September 24, 2024 Atlantic Shores received an Incidental Take Regulation ("ITR") and LOA from NMFS pursuant to the MMPA, 16 U.S.C. § 1371, setting out a wide range of conditions, mitigation measures, and monitoring and reporting requirements for Atlantic Shores' construction activities, including specific mitigation measures for installation of foundation monopiles, construction surveys using specified high-resolution geophysical acoustic sources, and vessel strike avoidance. *Id.*[6] The LOA is valid through December 31, 2029. *Id.*

### 3. CZMA

Atlantic Shores also coordinated closely with the New Jersey Department of Environmental Protection ("NJDEP"), submitting a consistency certification pursuant to the CZMA, 16 U.S.C. § 1451, voluntarily including offshore Project areas that are outside the State's scope of jurisdiction under the CZMA, demonstrating that the Project was consistent with New Jersey's enforceable coastal zone policies and committing to a wide range of mitigation measures for the Project's construction activities. Veldhoven Decl. ¶ 21.[7] On April 1, 2024, NJDEP concurred with Atlantic Shores' consistency certification, finding that the Project, as described in the COP, is consistent with the State's coastal zone management plan. *Id.* Atlantic Shores provided

---

[6] NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Atlantic Shores South Project Offshore of New Jersey, 89 Fed. Reg. 77972, 77972 (Sep. 24, 2024).

[7] Although the Project's lease areas do not fall within a "Geographic Location Description" for purposes of 16 U.S.C. § 1456(c)(3)(A) and the implementing regulations at 15 C.F.R. Part 930 Subparts D and E, Atlantic Shores voluntarily submitted a federal consistency certification to NJDEP for those areas.

BOEM with a copy of the concurrence letter as required by 30 C.F.R. 585.627(b) and the ROD. *Id.*

### C.    Financial Obligations and Commercial Commitments

To date, Atlantic Shores has incurred significant financial expenses to reach the current stage of Project development. Atlantic Shores has also expended significant funds by entering into extensive contracts for developing, permitting, engineering, and preparing for construction of Project 1, and taken other costly steps in reliance on the approvals and authorizations challenged here.[8] Similar activities have also been undertaken in support of Project 2. In addition to over one billion dollars in lease acquisition costs across all its leases, Atlantic Shores has incurred hundreds of millions of dollars in other development activities, including COP preparation activities, time intensive and costly surveys both onshore and offshore, extensive environmental reviews and consultations with federal and state agencies, multi-year permitting efforts for multiple permits with multiple agencies and jurisdictions, and public engagement in support of the various regulatory and lease requirements.

### D.    Plaintiffs' Complaint

The principal theory of Plaintiffs' Complaint is that the Federal Defendants acted arbitrarily, capriciously, and contrary to law in approving the Project and its associated authorizations. Compl. ¶¶ 1, 6–9. Plaintiffs specifically allege that NMFS issued the LOA in violation of the MMPA, *id.* ¶¶ 183–208; that NMFS issued the BiOP in violation of the ESA, *see, e.g.*, *id.* ¶¶ 74–118; that BOEM's approval of the FEIS violated NEPA, *id.* ¶¶ 59, 60–63; that BOEM's approval of the project also violated the CZMA, *id.* ¶¶ 8, 212–213; and that BOEM's

---

[8] Atlantic Shores has been forced to cancel many of its construction-related contracts due to the uncertainties caused by the Presidential Wind Memorandum and related adverse effects, *see infra* Section III.D., leading to additional costs.

approval of the Project COP violated OCSLA. *Id*. ¶¶ 219–228. Plaintiffs contend on the basis of these claims that all of the above approvals—which have taken years of expensive effort to obtain—should be "vacat[ed]" and "set[] aside" pursuant to the APA. *Id*. at 1, 89–90. To date, the Federal Defendants have not responded to the Complaint. Their deadline for doing so is September 9, 2025.

## III.    ARGUMENT

Atlantic Shores is entitled to intervene as of right in this action pursuant to Fed. R. Civ. P. 24(a)(2). Rule 24(a)(2) allows intervention as of right when (1) the motion to intervene is timely, (2) the proposed intervenor shows a legally protected interest in the action, (3) the action threatens to impair that interest; and (4) no party is an adequate representative of the proposed intervenor's interests. *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)). "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, 348 F.R.D. 397, 401 (D.D.C. 2025). "In addition to satisfying the four elements of Rule 24[,]" in the D.C. Circuit, prospective intervenors also "must possess standing under Article III of the Constitution." *Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003). Atlantic Shores satisfies all requirements for intervention as of right, as set forth below. Alternatively, Atlantic Shores satisfies all requirements for permissive intervention under Fed. R. Civ. P. 24(b).

### A.    The Motion is Timely.

Rule 24(a)(2)'s timeliness requirement is examined "in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the

applicant's rights, and the probability of prejudice to those already parties in the case.'" *Karsner*, 532 F.3d at 886 (quoting *United States v. British Am. Tobacco Austl. Servs., Ltd.*, 437 F.3d 1235, 1238 (D.C. Cir. 2006)) (internal quotations omitted). Here, Atlantic Shores has been timely in pursing intervention.

Atlantic Shores filed its motion a month after Plaintiffs filed their complaint, before Federal Defendants filed their answer; before any discovery has begun; and before this Court has issued a scheduling order. This timing is consistent with other motions to intervene that the D.C. Circuit has deemed timely. *See Karsner*, 532 F.3d at 886; *Farmer v. EPA*, 759 F. Supp. 3d 101, 110 (D.D.C. 2024) ("[B]ecause the motion was filed before this Court issued any merits decision, intervention would not unduly disrupt this litigation.").

None of the parties will be prejudiced by Atlantic Shores' timing. Instead, Atlantic Shores' timing conserved resources for both the parties and the Court because it intervened before the Court (or any party) has taken any action. *Karsner*, 532 F.3d at 886 ("[T]he Commissioner moved to intervene before the district court took any action—even by minute order—and thus did not act so late as to prejudice proceedings in that court."); *see Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 640 F. Supp. 3d 59, 67 (D.D.C. 2022) (parties were not prejudiced where "the prospective intervenors filed their motions within a few months after the original complaint was filed and weeks before the Plaintiffs filed their amended complaint and Defendants filed their answer to that amended complaint.").

Thus, Atlantic Shores' is moving to intervene in a timely manner.

**B.    Atlantic Shores Has an Interest Related to the Subject Matter of this Action.**

Rule 24(a)(2) requires showing a legally protected interest. *Karsner*, 532 F.3d at 885. In the D.C. Circuit, the Article III standing inquiry folds into the inquiry of whether the proposed intervenor has a legally protected interest under Rule 24(a). *Friends of Earth v. Haaland*, No.

9

CV 21-2317, 2022 WL 136763, at *2 (D.D.C. Jan. 15, 2022) (citing *WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 12 (D.D.C. 2010)). When a proposed intervenor like Atlantic Shores, has a legally protected interest under Rule 24(a), then "it will also meet constitutional standing requirements, and *vice versa.*" *Id.*; *Ctr. for Biological Diversity*, 640 F. Supp. 3dat 68 ("Constitutional standing sufficiently demonstrates this interest."). Article III standing requires (1) "an injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) "redressability." *Friends of Earth*, 2022 WL 136763, at *2 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)) (internal quotations omitted).

When proposed intervenors are the recipients of government authorizations or permits they have a legal interest that supports Article III standing. In *Ctr. for Biological Diversity*, 640 F. Supp. 3d at 64, a group of plaintiffs challenged the government's approval of applications for permits to drill for oil and gas in New Mexico and Wyoming. *Id.* A group of prospective intervenors that included drilling companies and other oil and gas entities along with permit holders, moved to intervene, and the court found they had a legally protected interest and constitutional standing. *Id.* at 68. The court reasoned that some of the prospective intervenors directly benefitted from the challenged permits as permit holders. *Id.* at 66. The court concluded that "[w]ere Defendants enjoined from taking further action on the approved [permits], [the] prospective intervenors would lose property interests and financial investments in their permits."

Courts across the country have similarly found that recipients of government authorizations or permits have legally protected interests in actions challenging said authorization or permits. *See also, e.g.*, *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998) (holding that logging companies had a substantial interest in defending the

government's approval of logging projects in the face of a challenge to enjoin the protects); *WildEarth Guardians v. U.S. Forest Serv.* 573 F.3d 992, 995-97 (10th Cir. 2009) (holding mine operator had sufficient interest in litigation challenging Forest Service's approval of mine expansion); *see also, e.g.*, *Chester Water Auth. v. Susquehanna River Basin Comm'n*, No. 14-CV-1076, 2014 WL 3908186, at *2–3 (M.D. Pa. Aug. 11, 2014) (finding that a permittee "clearly has an important interest in retaining and enforcing the benefits of the [approvals]" it received); *S.C. Coastal Conservation League v. Ross*, No. 18-cv-03326, 2019 WL 5872423, at *3 (D.S.C. Feb. 8, 2019) (granting intervention as of right to private companies issued IHAs by BOEM to conduct surveying in challenge brought pursuant to the MMPA and NEPA).

Like the intervenors in *Center for Biological Diversity* and other cases across the country, Atlantic Shores has a legally protected interest in the federal authorizations that are the subject of this litigation. Those interests include its rights under its already acquired leases for the development of wind energy projects in the OCS. Atlantic Shores has already incurred acquisition costs for these projects totaling more than $1 billion, and has incurred hundreds of millions of dollars in other development and site control activities, including time-intensive and costly surveys both onshore and offshore, extensive environmental reviews and consultations with federal and state agencies, multi-year permitting efforts for multiple permits with multiple agencies and jurisdictions, and public engagement in support of the various regulatory and lease requirements. Veldhoven Decl. ¶¶ 6, 22–24.

These interests would be substantially affected in concrete fashion by the relief Plaintiffs seek. As further discussed in the next section, that relief would unduly delay or halt all construction-related activities necessary to develop, construct, and operate the Project, thus depriving Atlantic Shores of the intended benefit of its leases, its substantial, ongoing

11

investment in required permits and authorizations, and of the site characterization activities it already has undertaken.

### C.    Disposition of this Case May Impair or Impede Atlantic Shores' Interests.

In addition to demonstrating a protectable interest in the subject matter of the litigation, a prospective intervenor must show that "disposing of the action may as a practical matter impair or impede" its interests. *Karsner*, 532 F.3d at 885 (citation omitted). In applying this requirement, the D.C. Circuit assesses the "practical consequences" of denying intervention to the applicant, including the commercial or economic consequences. *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (finding that danger of loss of market share from lower court decision satisfied the third Rule 24(a)(2) factor).

Plaintiffs' requested relief—to "vacate" or "set aside" the Project's ROD, COP, and LOA—would clearly affect or impair Atlantic Shores' interests as a practical matter. An order setting aside or enjoining these authorizations would prevent Atlantic Shores not only from developing the Project, but would result in catastrophic financial impacts, including the inability to enter into commercial business agreements and resume contractual obligations, the inability to recoup the value of fully vested leasehold interests, and the loss of investments made in reliance on fully-issued permit authorizations needed to develop the Project. Veldhoven Decl. ¶¶ 22–25. Atlantic Shores has already incurred significant financial expenses and had entered into extensive contracts for developing, permitting, engineering, and preparing for construction of Project 1, and has taken other steps in reliance on the approvals and authorizations challenged here. Similar activities have also been undertaken in support of Project 2, which was contemplated to be built in succession after Project 1. *Id.* ¶¶ 23–24.

And as discussed *supra* Section III.B., where a movant seeks intervention to defend the validity of a government authorization it has been granted, a decision in the movant's absence would clearly impair its ability to protect its interest in such authorization. *See Friends of the Headwaters v. U.S. Army Corps of Eng'rs*, No. CV 21-0189, 2021 WL 1061162, at *3 (D.D.C. Mar. 20, 2021) (granting intervention where plaintiff's requested relief "would as a practical matter impede" the project developer's ability to proceed with its project and could result in additional costs and delay); *see also Friends of Animals v. Ashe*, No. CV 15-0653, 2015 WL 13672461, at *3 (D.D.C. June 12, 2015) (finding that where "movants have an interest in the permits at issue . . . . a decision in their absence would impair their ability to protect that interest").

Under the terms of its lease as well as the applicable statutes and regulations, Atlantic Shores needs all the challenged authorizations before it can conduct any construction activities. *See, e.g.*, 30 C.F.R. §§ 585.600, 585.620(c), 585.628; Project 1 Conditions of COP Approval § 1.1 (noting that Atlantic Shores "must conduct all activities as proposed in its approved COP for the Project" and "must comply with all applicable requirements in commercial Lease OCS-A 0499, statutes, regulations, consultations, and permits and authorizations issued by federal, state, and local agencies for the Project."). For example, under the MMPA and associated regulations, Atlantic Shores must have a valid ITR/LOA under 16 U.S.C. § 1371(a)(5)(A) in order to "take" or "harass … any marine mammal." 16 U.S.C. § 1371(a); 16 U.S.C. § 1362(13). Because Project-related construction activities have the potential to unintentionally harass marine mammals, an order setting aside or enjoining the LOA would prevent Atlantic Shores from carrying out its obligations under the MMPA and its lease.

Terminating the Project's authorizations also could impact critical contracts and investments in the future. For example, terminating Project authorizations likely would prevent

13

Atlantic Shores from obtaining new ORECs with the State of New Jersey—or other offtake agreements with nearby states—to sell the electricity it will generate from the Project and impair Atlantic Shores' ability to enter into interconnection services agreements to connect the Project to the regional transmission grid. Veldhoven Decl. ¶ 32.

Even if the Project authorizations are not vacated outright but remanded back to the relevant agencies (perhaps indefinitely) or merely modified, any changes in the scope of the authorizations also could have a severe adverse impact. The ROD, Conditions of COP Approval, LOA, and BiOp include significant measures that Atlantic Shores must take to mitigate the impact of its activities on the marine environment. Veldhoven Decl. ¶ 36. If Plaintiffs' claims resulted in an expansion of such mitigation measures that are technically or economically challenging or infeasible, this could dramatically increase the cost of the Project or cause further delays before the additional mitigation measures can be implemented. *Id*.; *see also Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 975 (8th Cir. 2014) (holding that electric generating company had standing to intervene in case where petitioners sought to impose additional requirements on company's plant).

### D. The Federal Defendants Do Not Adequately Represent Atlantic Shores' Interests.

In general, a proposed intervenor's burden to show that existing parties do not adequately represent its interests is "minimal" and is satisfied by a showing that representation "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (stating that under *Trbovich* the requirement of showing inadequate representation "is not onerous"). Federal courts frequently find that federal agency defendants "do not adequately represent the interests of aspiring intervenors." *Farmer*, 759 F. Supp. 3d at 110–11 (finding that the federal agency defendant did not adequately represent

14

private party movants' operational and financial interests); *Nat. Res. Def. Council*, 561 F.2d at 911–12; *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 338 F.R.D. 1, 6 (D.D.C. 2021) (finding federal government did not adequately represent energy company's interests in action challenging discharge permit it had been granted for construction and replacement of pipeline). Indeed, "[g]overnmental entities generally cannot represent the more narrow and parochial" interests of private parties, *Salazar*, 272 F.R.D. 4, 15 (D.D.C. 2010), because "government entities are usually charged with representing the interests of the American people, whereas aspiring intervenors, like the intervenor-applicants here, are dedicated to representing their personal interests or the interests of their members or members' businesses." *Farmer*, 759 F. Supp. 3d at 110–11 (citations omitted; cleaned up).

Here, Atlantic Shores' specific commercial interest in the Project, its lease areas, and the billions of dollars in COP preparation, survey activities, NEPA and other permitting review and consultation processes, public engagement, and contractual commitments it has undertaken and will undertake to support those activities show that the Federal Defendants do not adequately represent Atlantic Shores' interests. *See W. Energy All. v. Zinke*, 877 F.3d 1157, 1168 (10th Cir. 2017) (explaining that it's possible that government agency's position may not "remain static or unaffected by unanticipated policy shifts"); *Kleissler*, 157 F.3d at 974. Indeed, the Federal Defendants, notwithstanding their prior full-throated approval and defense of their authorizations for the Project, have recently taken action that is directly adverse to Atlantic Shores' interests. Veldhoven Decl. ¶¶ 27–31.

On January 20, 2025, the current administration issued a Presidential Memorandum that, among other things, withdrew all unleased areas of the OCS from further offshore wind leasing, froze permits and approval for onshore and offshore wind projects pending a "comprehensive

15

assessment and review of Federal wind leasing and permitting practices," and authorized the Attorney General to delay active wind litigation pending completion of the Memorandum's "comprehensive assessment."[9] On the basis of the Memorandum, the EPA recently remanded the Project's Clean Air Act permit. More recently, in the past two weeks, the Department of the Interior has taken additional adverse actions against the wind industry through the issuance of Secretarial Orders and Memoranda requiring, among other things, a department-wide review of existing wind and solar projects, an examination of existing litigation regarding any "approval of a wind or solar project" to "identify cases where remand of any such approvals to the Department would be appropriate," and consideration of alternatives to proposed wind and solar projects for projects with allegedly higher "capacity densities."[10] The Wind Memorandum, recent Secretarial Orders, and other adverse actions taken by the current administration against renewable energy

---

[9] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) ("Wind Memorandum").

[10] U.S. Dep't of the Interior, Order No. 3437, Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision Making  § 5 (July 29, 2025), https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign (on file with author); U.S. Dep't of the Interior, Order No. 3438, Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025), https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting (questioning whether "the use of Federal lands for *any* wind and solar project is consistent with the law") (on file with author); Memorandum from Gregory Wischer, Deputy Chief of Staff – Policy, to Acting Assistant Secretary for Fish and Wildlife and Parks, Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315 (Aug. 4, 2025), Doug Burgum (@SecretaryBurgum), X (Aug. 4, 2025, at 6:48 PM ET), https://x.com/SecretaryBurgum/status/1952501870393786822 (implementing changes in legal interpretations that are unfavorable to offshore wind approvals and incidental take permits) (on file with author); *see also* Memorandum from Gregory Wischer, Deputy Chief of Staff – Policy, to the Assistant Secretaries, Bureau and Office Heads (July 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other (requiring additional levels of review for all "decisions, actions, consultations, and other undertakings" related to permitting of wind and solar facilities) (on file with author).

16

projects, have created significant uncertainty in the offshore wind industry and raise concerns regarding whether Federal Defendants can adequately represent Atlantic Shores interests in this matter.[11] Veldhoven Decl. ¶¶ 27–31; *see also Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 66 F.4th 282, 285 (D.C. Cir. 2023) ("Interior, having started out as an ally, is now [an] adversary. That in itself is enough to disqualify Interior as a faithful representative of [prospective intervenor's] interest in this lawsuit.").

Even if the Federal Defendants continue to defend their prior Project approvals, Atlantic Shores' specific commercial interests are more directly impacted by the details of how and when Plaintiffs' claims are adjudicated. *Nat. Res. Def. Council*, 561 F.2d at 912 (noting that "a shared general agreement … does not necessarily ensure agreement in all particular respects"). For example, Atlantic Shores has substantial financial and schedule obligations, considerations which the Federal Defendants do not face. Veldhoven Decl. ¶ 35. For instance, Atlantic Shores must demonstrate fulfillment of certain measures to its investors on specific timetables that could be impacted by this litigation.

Beyond these divergent interests, Atlantic Shores also brings considerable technical expertise that will assist the court in evaluating the merits of this action. *See, e.g.*, *Nat. Res. Def. Council*, 561 F.2d at 913 (allowing companies regulated by EPA to intervene in case involving EPA decisions that "turn on questions of very technical detail and data," because the companies' "experience and expertise in their relevant fields" could "contribute" to the court's resolution of the issues). Atlantic Shores has been studying potential environmental impacts of the Project and the associated authorizations, as well as the commercial and technical opportunities with offshore

---

[11] Plaintiffs also formally petitioned the U.S. government to cancel the leases for this Project and other Atlantic Shores projects, seeking to bypass this court's review of the federal approval of the Project. Veldhoven Decl. ¶ 30.

17

wind energy development offshore of New Jersey, for a significant amount of time and has on-the-ground insights into what are feasible and reasonable technologies and methodologies that can be deployed to mitigate risks.

### E.    Alternatively, Atlantic Shores Seeks Permissive Intervention.

Permissive intervention is also appropriate. Rule 24(b) allows this Court to "permit anyone to intervene" who has filed a "timely motion" and "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1), (B). The D.C. Circuit has interpreted the Rule to require the proposed intervenor to show "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 340 F.R.D. 1, 5 (D.D.C. 2021) (citing *Equal Emp. Opportunity Comm'n v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)). After a proposed intervenor shows that it meets the three requirements, then the court determines "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.* at 6 (quoting *In re Endangered Species Act Section 4 Deadline Litigation*, 270 F.R.D. 1, 6 (D.D.C. 2010)) (internal quotations omitted)

Each of these factors supports permissive intervention. First, the Court has federal question jurisdiction over this matter, so "it has independent jurisdiction over the movants' answers and future motions." *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 14 (D.D.C. 2019). Second, as explained above, *supra* Section III.A., Atlantic Shores timely moved to intervene a month after the complaint was filed. Third, Atlantic Shores' defenses share common questions of law and fact with the issues raised by Plaintiffs' Complaint because they directly involve the validity of Atlantic Shores' Project and associated authorizations. For example, as to Atlantic Shores' ESA and MMPA authorizations, the Complaint alleges that "Plaintiffs seek orders

vacating and setting aside as unlawful the recent project Record of Decision . . . issued by BOEM approving Atlantic Shores South . . ., the Biological Opinion, and the Letter of Authorization issued by NMFS for Atlantic Shores." Compl. ¶ 1. Atlantic Shores will defend the authorizations by contesting Plaintiffs' claims on multiple legal and factual grounds, which is sufficient to meet this requirement. *Bernhardt*, 331 F.R.D. at 14 ("Rule 24(b)'s common claim or defense requirement is not interpreted strictly so as to preclude permissive intervention." (quoting *Nuesse v. Camp*, 385 F.2d 694, 704–05 (D.C. Cir. 1967))). Finally, for the reasons previously explained, *supra* Section III.A., Atlantic Shores' intervention will not unduly delay or prejudice the adjudication of the parties' rights.

## IV.    CONCLUSION

For the reasons set forth above, Atlantic Shores respectfully requests the Court grant its motion to intervene as a matter of right pursuant to Rule 24(a)(2), or, in the alternative, grant permissive intervention under Rule 24(b)(1)(B).

Respectfully submitted,

/s/ Hilary Tompkins
Hilary Tompkins (DC Bar No. 252895)
Brian Malat (DC Bar No. 1736216)
**HOGAN LOVELLS US LLP**
555 13th Street N.W.
Washington, D.C. 20004
Phone: (202) 637-5617
hilary.tompkins@hoganlovells.com
brian.malat@hoganlovells.com

Dated:  August 12, 2025                    *Counsel for Proposed Intervenor-Defendant*
                                           *Atlantic Shores Offshore Wind, LLC*

19

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2025, I caused to be served true and correct copies of the foregoing, in accordance with the Federal Rules of Civil Procedure, via the Court's CM/ECF system, upon all parties who receive notice of the filing via the Court's CM/ECF system.


> */s/ Hilary Tompkins*
> Hilary Tompkins

20